1

2

3

4

5

6

7

8            UNITED STATES DISTRICT COURT

9           CENTRAL DISTRICT OF CALIFORNIA

10

11

| | |
|---|---|
| MORI RUBIN, regional director of Region 31 of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, | ) CASE NO. CV 14-09534 MMM (FFMx) |
| | ) |
| | ) ORDER GRANTING PETITIONER'S |
| | ) MOTION FOR PRELIMINARY |
| | ) INJUNCTION |
| Petitioner, | ) |
| | ) |
| vs. | ) |
| | ) |
| VISTA DEL SOL HEALTH SERVICES, INC., d/b/a VISTA DEL SOL HEALTHCARE | ) |
| | ) |
| | ) |
| Respondent. | ) |
| | ) |
| | ) |

20        On December 12, 2014, Mori Rubin, regional director of Region 31 of the National Labor

21   Relations Board, acting for and on behalf of the National Labor Relations Board (the "Board"), filed a

22   petition seeking a temporary injunction under Section 10(j) of the National Labor Relations Act

23   ("NLRA"), as amended 29 U.S.C. § 160(j), against Vista Del Sol Health Services, Inc. ("Vista").[1]  The

24   petition seeks injunctive relief based on Vista's purported violations of § 8(a)(1), (3), and (5) of the

25

26

27        [1]Petition for Temporary Injunction, Docket No. 1 (Dec. 12, 2014).  See also Memorandum of

28   Points and Authorities in Support of Petition for Temporary Injunction ("Petition"), Docket No. 3 (Dec. 12, 2014).

NLRA, which prohibit unfair labor practices.[2]  Vista opposes the petition.[3]

## I.  FACTUAL BACKGROUND

### A.    Vista Del Sol Healthcare

Vista operates a nursing facility located in Los Angeles, California.  The facility is divided into a skilled nursing division that goes by the Vista name, and an assisted living division known as Casa Del Mar.[4]  Vista employed approximately 62 employees in October 2013, including Rosa Valdivia, the facility's top management official; Jeri Warner, director of nursing; Ester Cuellar, assistant director of staff development; Vida Zelaya, director of staff development; and Arcadio De Borja and Ingrid Castillo.[5]  Valdivia, Warner, and Cuellar are high ranking supervisors with authority to terminate employees.[6]

### B.    The Beginning of Union Organizing

In early August 2013, the Service Employees International Union-Long Term Care Workers ("SEIU-ULTCW" or the "union") began organizing employees at Vista.[7]  Several organizers made house

---

[2]Specifically, these sections provide: "It shall be an unfair labor practice for an employer – "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; . . . (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization; . . . [and] (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."  29 U.S.C. § 158(a)(1), (3), (5).

[3]Opposition to Petition for Temporary Restraining Order ("Opposition"), Docket No. 16 (Dec. 22, 2014).

[4]Petition, Exh. 5 at 656 (Commerce Stipulation).  See also *id*., Exh. 3 at 513:12-514:4 (Rosa Valdivia Affidavit) ("The facility consists of essentially two parts.  First, there is a 50 bed nursing facility, which is commonly referred to as 'Vista.' . . . There is also a board and care assisted living facility . . . referred to as Casa Del Mar.").

[5]*Id*. at 682-84 (Employee List).

[6]*Id*., Exh. 2 at 74 (admitting that Valdivia, Warner, and Cuellar are high ranking supervisors).

[7]*Id*., Exh. 3 at 332 (Diana Hong Affidavit, ¶ 5) ("The Union began speaking to employees at the facility in about August of 2013 in an attempt to organize them.  I myself and several organizers went out and made house visits to employees.  We started getting some leads and built a committee of employees to be an organizing committee.  The Union did not formally notify the Employer of the employees on this organizing committee").  See also *id.* at 496 (Rosa Lopez Affidavit, ¶¶ 14-15)

1   visits and conducted meetings with the employees.[8]

2   Valdivia admitted that by August 8, 2013, she had "learned that there was some kind of union

3   activity going on."[9]   Marcos Salvador reports that, at approximately the same time, *Id.*, "Valdivia called

4   a meeting of employees.  It took place in the hallway to the right of the nurse's station.  There was Renya

5   Artola, Kiran [Singh], Remedios Lopez, Jeanette Aguillera, and myself.  Ester [Cuellar] was there also.

6   Valdivia did the speaking. . . . She said that we needed to be careful because there were some thieves

7   visiting houses because they had stolen some documentation from her including all the employee

8   information.  She said that they would identify themselves as from the [u]nion.  She said this was not

9   true and they were actually thieves. . . . She said that we should not open our doors because they would

10  look at everything we had so that they could steal it."[10]   Rosa Lopez states that Valdivia called her

11  cellular telephone sometime after the union visited her and told her that she "should not let them in

12  because they might be thieves."[11]

13

14  On October 11, 2013, union representatives Jose Manzano and Edward Gutierrez held two

15  meetings at a McDonalds.  The first took place at approximately 1:00 pm.  Two Vista employees were

16

17  ─────────────────

18  ("Sometime perhaps during July of 2013, representatives from the Union came to my house. . . . After this house visit, the Union stated having meetings in July").

19
20  [8]*Id.*, Exh. 3 at 332 (Diana Hong Affidavit, ¶ 5).

21  [9]*Id.*, Exh. 3 at 513:22-23 (Rosa Valdivia Affidavit) ("[E]mployees stated reporting to me various incidents [and on] 8/8/13 I learned that there was some kind of union activity going on").

22  [10]*Id.*, Exh. 3 at 381 (Marcos Salvador Affidavit, ¶ 14).

23  [11]*Id.*, Exh. 3 at 497 (Rosa Lopez Affidavit, ¶ 16) ("I think the Employer had a general idea that
24  there was some union organizing going on.  Sometime around July, a few days after the Union visited
25  me, Rosa Valdivia called me. . . .  She told me that she heard people were visiting employees at their
    homes.  She said that I should not let them in because they might be thieves.  She did not mention the
26  word union").  Salvador and Rosa Lopez assert that the meetings they had with union organizers took
    place in July.  Because, however, the union did not begin to contact Vista employees until August 2013,
27  as stated in the affidavits of the union organizers, the court assumes the meetings took place in early
    August 2013, before the August 14, 2013 presentation of the petition.  (See *id.* at 332 (Diane Hong
28  Affidavit, ¶ 5) ("The Union began speaking to employees at the facility in about August of 2013").)

present: Silvia Figueroa and Lerma Davis; both signed union authorization forms.[12]  A second meeting was held later in the day.  Elisa Mayorga, Marcos Salvador, Rosa Lopez, Remedios Lopez, Reyna Artola, Ivania Ruedas, and Genaro Meza were present, and each signed a union authorization form.[13]  By October 14, 2013, Vista employees had obtained signatures from a majority of employees; at 3:30 or 4:00 pm that day, the union gave Valdivia a signed union petition.[14]  Figueroa, Salvador, Davis, Mayorga, Ruedas, Rosa Lopez, Remedios Lopez, Xenon Perez, Jeanette Aguilera, Aurora Maria Rodrigues, Reyna Artola, Maria Ramirez, Martha Aparicio, Rosalva Salazar were present, wearing purple Service Employees International Union scrubs.[15]  Salvador spearheaded presentation of the petition to Valdivia; speaking in Spanish, he allegedly demanded union recognition and requested that Valdivia sign the petition.  Valdivia allegedly responded, also in Spanish, that she would not sign the petition and said she would contact her attorney.[16]

### C.    Vista's Response to its Employees' Attempt to Unionize

#### 1.    Policy Changes

On October 14, 2013, at approximately 3:00 pm, just prior to presentation of the union petition, Valdivia stopped Maria Ramirez and asked her about the union authorization cards that were being circulated and why she had signed the union "list."[17]  After the petition was presented, Valdivia – who appeared "very upset and angry," told all off-duty employees to leave the facility.[18]  Petitioner contends that this was a departure from ordinary practice, as "[t]here was no problem" with employees coming

---

[12]*Id*., Exh. 3 at 363 (Jose Manzano Affidavit, ¶ 3).

[13]*Id*., ¶ 4.

[14]Id., Exh. 3 at 334 (Diana Hong Affidavit, ¶ 11).

[15]*Id*.

[16]*Id*.

[17]*Id*., Exh. 3 at 403:12-404:15 (Maria Ramirez Affidavit).

[18]*Id.,* Exh. 3 at 341:3-5 (Confidential Witness Statement of Elisa Mayorga).

to the facility on days they were not working.[19]

Valdivia and Warner, the director of nursing, held meetings with several employees after the union petition was presented, and announced that the company would no longer tolerate employees arriving after the seven minute grace period at the start of their shift, and that employees who arrived late would be subject to discipline, including termination.[20]  The meetings apparently took place during the week of October 14, 2013; the record does not reflect the precise date.  On October 15, 2013, Valdivia met with housekeeping department employees.  She informed them that Vista was going to enforce a more strict dress code policy, and would prohibit the wearing of any logos.[21]  Petitioner contends this effectively prevented employees from wearing union insignia.

### 2.   Polling and Interrogation

Petitioner contends that from October 17 to 21, 2013, Valdivia polled and interrogated employees.  Specifically, petitioner asserts that Valdivia gave employees a form to sign asking them to indicate whether they had voluntarily or involuntarily signed the union petition.[22]  On October 18, 2013, Valdivia purportedly asked Meza if he knew what he had signed, if he knew what he was doing, and

---

[19]*Id.*, Exh. 3 at 519:19-21 (Valdivia Statement) ("Sometimes, employees would come to the facility on their days off . . . .  There was no problem with this").

[20]*Id.*, Exh. 3 at 298 (Confidential Witness Statement of Carmelina Perdomo) (noting that Valdivia called her into her office with co-workers Genero Meza, Elisa Mayorga, Rosa Lopez, and Dafny Cobar, and said that they all "had to be exactly on time from now on," and that the "seven minute grace period" (in place under a former owner) was all the grace period they would get).

[21]*Id.*, Exh. 3 at 314-15 (Confidential Witness Statement of Dafny Cobar) ("Valdivia also said something with respect to not wanting uniforms with any type of logos on them. . . .  Before the meetings that took place during the week of October 14, I also do not remember any type of rule regarding uniforms").  See also *id.* at 341:17-18 (noting that a "paper" from Vista indicated that Vista "did not want [employees] to wear any shirts that have letters on them").

[22]*Id.*, Exh. 3 at 480:21-481:11 (Romana Lopez Affidavit, ¶ 16) ("On about October 20, at the end of my shift, after I clocked out, Rosa Valdivia came up to me.  She had an envelope in her hand and it had my name written on it.  She just handed me the envelope and she did not say anything. . . .  When I opened it, it contained a letter in English that I could not understand because I do not read or speak English.  A copy of this is attached as Exhibit 3").  See also Lopez Affidavit, Exh. 3 (Letter from Vista re: "Union Affiliation by means other than Voluntary").

what the union had promised him in return.[23]   After he explained that employees wanted someone to represent them, Valdivia said that "the trust had ended"and that he had "betrayed her."[24]   On October 20, De Borja, a charge nurse, questioned Ramirez concerning her union involvement.  When Ramirez declined to comment, De Borja ordered her to answer.[25]  The next day, Valdivia asked Rosa Lopez if she had been forced to sign the union petition; she promised that Lopez would keep her job as long as she wanted it if she signed a document stating that she had been forced to sign the petition.[26]

Petitioner alleges that on October 23, 2013, Cuellar impliedly threatened Meza by telling him that Valdivia was "well prepared" to respond to the union organizing and that the employees "should all be careful;" indeed, Cuellar purportedly went so far as to say that she "felt sorry for [the employees] because Valdivia was so well-prepared against [them]."[27]

In an October 9, 2014 letter to the NLRB,  Vista's lawyer stated that the entire facility might be forced to close if the employees were unwilling to accept the company's settlement offers.[28]  Petitioner assert this is a threat that if Vista employees do not stop attempting to organize a union, the company will close the facility.

### 3.    Discharge of Employees

---

[23]*Id*., Exh. 3 at 350:16-23 (Genaro Meza Affidavit, ¶ 16) ("Probably on October 18[,] [i]t was just me and [Valdivia] in her office.  She asked me what it was that I was doing.  I said about what.  She asked if I knew what I had signed and if I knew what I was doing.  She asked me what the men were promising us.  I said that I did not know.  I said that we wanted someone to represent us because whenever we came to her office she would never want us to express ourselves or our opinions").

[24]*Id*. ("She said the trust had ended.  She said that she did not trust me anymore because I betrayed her").

[25]*Id*., Exh. 3 at 407 (Maria Ramirez Affidavit) ("Charge Nurse [De Borja] asked me if I was a member of the Union; he asked me this in English. . . . When he asked me this, I only looked at him.  He told me to tell him, and then I replied yes and that I was ready to go, for them to fire me.").

[26]*Id.*, Exh. 3 at 500:14-22 ("She said that if I had been forced, I should sign that I was forced.  She said that if I signed that I was forced I would have my job as long as I wanted it").

[27]*Id*., Exh. 3 (Genaro Meza Affidavit) at 352:2-3.

[28]*Id*., Exh. 5 at 770 (Settlement Offer to NLRB at 2) ("We strongly suggest that the Board ensure that the employees are aware of these offers and that they have a say in the decision.  They may not like the alternative. . . .  Therefore, the only alternative [Vista] will have is to close down its facility.").

### i.   Martha Aparicio and Defina Sanchez

Petitioner contends that Martha Aparicio and Delfina Sanchez were discharged in order to discourage employees from engaging in union activities.  On October 6, 2013, these certified nursing assistants ("CNAs") were scheduled to work their usual 11:00 p.m. to 7:00 a.m. shift at Vista, together with charge nurse Jennifer Abaunza and CNA Maria Lopez.  At approximately 3:50 a.m. on October 7, 2013,[29] Abuanza told Aparicio that she could take her break.  Aparicio fell asleep in the nurse's station near Sanchez and Lopez.[30]  Roughly an hour later, Abaunza said that Thomas Adelman, the son of a Vista patient, had just taken photographs of Aparicio, Sanchez, and Lopez sleeping, and told them all to wake up.[31]  Adelman, who was upset the nurses were sleeping, showed the photographs to Valdivia.

The next day, Warner called Ingrid Castillo, a charge nurse, into her office to discuss the incident because she believed that Castillo had been involved.  After the meeting, Castillo told the CNAs that they needed to take turns taking naps in the future.[32]  The Vista employee handbook states that sleeping on the job is a violation that can lead to termination following the first offense.  Vista contends it had

---

[29]Petitioner contends that the date of the incident was October 7, 2013, despite Aparicio's references to other dates.  They based this on the witness statement of Thomas Adelman and the photographs he took at the hospital.  (See *id.*, Exh. 3 at 535 (Thomas Adelman Affidavit) (stating he observed the nurses sleeping on October 7, 2013).)  Because Vista does not dispute that the incident occurred on October 7, 2013, the court proceeds under that assumption.

[30]*Id.*, Exh. 3 at 326 (Delfina Sanchez Affidavit, ¶ 10) ("There was sitting in front of me Maria Lopez (CNA) and Martha Aparicio (CNA).  Also the charge nurse was sitting next to me.  This was the charge nurse Jennifer [Abaunza].  I was closing my eyes.  No one else was.  Apparently I must have fallen asleep for a few minutes or so. . . .  Maria Lopez, Martha Aparicio and Jennifer all fell asleep.  I saw them all sleeping").

[31]*Id.*, Exh. 3 at 426 (Martha Aparicio Affidavit, ¶ 21) ("At a certain point, I heard someone say 'girls!' and we all woke up.  It looked like Maria and Defina had been asleep.  I think they were asleep.  It looked like they were just waking up. . . .  She said the son of the patient in room 18 had just taken pictures of us.  We all got up and continued working").  See also *id.* at 326 ("[Abaunza] said someone just took pictures of us and we should all wake up.  We all asked who.  She said the patient's son").

[32]*Id.*, Exh. 3 at 369 (Lerma Davis Affidavit, ¶ 6).

1  never before had an issue with employees sleeping on the job.[33]  Several CNAs assert, however, that

2  CNAs and charge nurses regularly slept during the night shift, that charge nurses knew this, and that

3  CNAs were not disciplined for doing so.[34]  Indeed, Sanchez states that even after the October 7, 2013

4  incident, CNAs continued to sleep during the night shift.[35]  After the incident and after Castillo's

5  meeting with Warner, Sanchez and Aparicio worked their regularly scheduled shifts on October 7, 8, and

6  11-14, 2013 without issue.[36]

7      Aparicio participated in the presentation of the union petition on August 14, 2013, which

8  included both her and Sanchez's names, but not Maria Lopez's name.[37]  On October 15, 2013, Sanchez

9  met with Warner, who said she was obligated to terminate her because Sanchez had slept on the job.[38]

10  Warner stated that four people had been sleeping and that all were being fired.[39]  Aparicio met with

11  Warner and Cuellar on October 18, 2013, and was told that she too was being terminated for sleeping.

12  When she explained that Castillo had given her permission, as she had done for years, Warner said the

---

14  [33]*Id.*, Exh. 5 at 677-78 (Vista Employee Handbook) (listing "sleeping on the job" as a "Group

15  II" violation for which the penalty for a first offense is "Termination of Employment"); *id*. at 777
    (Vista's Response to Subpoena *Duces Tecum*, ¶ 13) (stating that, in Valdivia's experience as
    administrator for seven years, "there ha[d] never been an incident related to '[s]leeping on the job'").

17  [34]*Id.*, Exh. 3 at 325 (Delfina Sanchez Affidavit, ¶ 1) (stating that when Cuellar hired her, she said

18  "I was allowed to sleep during the night shift"); *id.* at 368-69 (Lerma Davis Affidavit, ¶ 4) ("The charge
    nurse knows that we would sleep. . . .  No charge nurse has ever told me I am not allowed to sleep at

19  work.  No supervisor or manager has ever told me that I'm not allowed to sleep at work.  Basically, when
    there isn't any work to do, CNAs will sit at the nurses's station and wait for patients to call.  The CNAs

20  often doze off and no one cares").

21  [35]*Id.*, Exh. 3 at 328 (Delfina Sanchez Affidavit, ¶ 23).

22  [36]*Id.*, Exh. 5 at 752 (Vista Employee Work Schedule October 2013).

23  [37]*Id.*, Exh. 3 497 (Rosa Lopez Affidavit, ¶ 18) (indicating that Martha Aparicio was present when

24  the petition was presented to Valdivia).

25  [38]*Id.*, Exh. 3 at 328 (Defina Sanchez Affidavit, ¶ 23) ("She said that she was sorry but that she

26  was obligated to terminate me.  She that I was not a good nurse because I had fallen asleep when I was
    not supposed to have done so").

27  [39]*Id.* at 329 ("She said that she had three photographs of those who were found to be asleep.  I

28  said it was actually four of us.  She said that she had already fired them").

orders came from Valdivia and that she had to terminate Aparicio.[40]

Lopez was not terminated.  Vista contends this is because Adelman's photographs did not show that she had been sleeping and did not otherwise implicate her in the incident; it also asserts that on the day of the incident, Lopez was scheduled to work at Casa Del Mar – "located in another building."[41]

### ii.    The Housekeeping Department

From October 25 to 28, 2013, Vista laid off seven of the eight employees in its housekeeping department, replacing them with five individuals provided by an independent contractor, Pro-Clean.[42] The employees had received no information that Vista was going to subcontract their work prior to their discharge.  Six of the employees – Meza, Cobar, Mayorga, Romana Lopez, Rosa Lopez, and Maria Isabel Valladares nee Menjivar – signed the union petition; two – Rosa Lopez and Mayorga – were present when the union petition was served on Valdivia on October 14, 2013.[43]  The only housekeeping

---

[40]*Id.*, Exh. 3 at 427 (Martha Aparicio Affidavit, ¶ 28) ("I told [Warner] that the night shift charge nurse gave me permission [to sleep] so I thought it was okay and I was doing that for years. . . . She said [ ] they were going to have to let me go. . . .  She said that they were orders from Rosa Valdivia and that she had to terminate me").

[41]*Id.*, Exh. 5 at 774 (Vista's Subpoena Duces Tecum Responses, ¶ 6) ("Lopez was indicated by terminated employees as being involved in the 'Sleeping on the job' occurrence, but neither the family member's photograph [n]or the testimonial indicated her as an accomplice.  Additionally, Lopez was scheduled to work as a [CNA] at [Casa Del Mar], which is located in another building entirely.  The matter was followed up by the Administrator, but no substantiating evidence was provided against [Lopez] in the matter").

[42]*Id.*, Exh. 3 at 514 (Rosa Valdivia Affidavit) ("We used to have a housekeeping department consisting of housekeepers that reported directly to me.  There were approximately six or seven housekeepers.  These employees were laid-off at the end of October 2013 . . . and we are now using the services of an outside company called 'Pro-Clean,' [that] provides all of the housekeeping services").  Although this suggests all housekeeping employees were laid off, Vista concedes that Lopez was a member of this department, and asserts that he was retained because Pro-Clean could not provide maintenance services at all necessary hours.  (*Id.* at 779 (Response to Subpoena *Duces Tecum*, ¶ 20) ("Ramon Lopez is still employed by Employer.  Due to the fact that Pro[-C]lean could not provide afternoon or weekend maintenance").)

[43]*Id.*, Exh. 3 at 401 (signed union petition); *id*. at 497 (Rosa Lopez Affidavit, ¶ 18) (indicating that Rosa Lopez and Elisa Mayorga were present when the petition was presented to Valdivia).

1   employee Vista retained was Ramon Lopez, who expressed anti-union sentiments.[44]  Vista asserts that

2   it retained Lopez because Pro-Clean was providing only housekeeping services, and/or because it could

3   not provide afternoon or weekend maintenance.[45]

4

5           **4.**      **Wage Increases to Bargaining Unit Employees**

6        On approximately October 10, 2013, Vista gave two employees a 50 cent an hour raise.[46]

7   Petitioner asserts this was done in an effort to discourage them from supporting the union.  In December

8   2013, Vista gave all CNAs a wage increase of 50 cents an hour.  This was discretionary and

9   unscheduled;[47] most employees had not received a raise in at least six years, which was one of the

10  reasons they supported the union.[48]

11          **5.**      **Overt Hostility Towards Union**

12       In January 2014, Warner, who was still director of nursing at the time, sent a series of text

13  messages to Remedios Lopez.  The messages stated:

14         •    "[Valdivia] did get rid of house keeping & laundry because she said the CNA will need

15

16

---

17      [44]*Id.*, Exh. 3 at 443:2-7 ("My understanding is that Ramon was against the union.  When the
18  employees were petitioning to have [SEIU-ULTCW] represent us, Ramon asked us why we wanted a
    union.  He said that we were just throwing our money away, and that the Union was just taking our
19  money").

20      [45]*Id.*, Exh. 5 at 711 (Response to Charges, ¶ h) ("Yes, [Roman Lopez] remains on the payroll as
    a maintenance employee as ProClean services are for housekeeping only, not maintenance"); *id.* at 779
21  (Response to Subpoena *Duces Tecum*, ¶ 20) ("Ramon Lopez is still employed by Employer.  Due to the
22  fact that Pro[C]lean could not provide afternoon or weekend maintenance").

23      [46]*Id.*, Exh. 3 at 404 (Maria Ramirez Affidavit) ("Valdivia had already given me a raise of 50 cents
    per hour, which took place for the first time on my October 10 check.  Since approximately October 2,
24  Administrator Valdivia had already told me that she would be giving me a small raise . . .  I think that
25  [she] gave me the raise because she found out that I signed the petition supporting the Union").

26      [47]*Id.*, Exh. 5 at 761 (Response to Charges, ¶ 1) ("All Certified Nursing Assistants [ ] were
    given a $.50 raise in December 2013.  Raises are not scheduled per any employment contract").

27      [48]*Id.*, Exh. 3 at 443 (Remedios Lopez Affidavit) ("Like the other employees, I supported the
28  Union because many of the employees had not gotten a raise in six years").

1    50% vote I didn't agree with her practices so she has to fire me too."[49]

2    •    "I am writing corporate to let them now that [Valdivia] was retaliating against the

3    CNA."[50]

4    •    "[Valdivia] was so mad about this union business [she] did [not] even want [to] do the

5    employee of the month which I said should b[e] [yo]u [(Remedios Lopez)] and Marcos

6    [Salvador]!  Nope she w[a]s [too] mad."[51]

7    **C.    Vista's Response to Union Formation Caused Some Employees to Fear Losing**

8    **Their Jobs As a Result of Supporting the Union**

9    Several Vista employees testified that they were scared they would lose their jobs because they

10   supported the union.   On October 29, 2013, Maria Ramirez stated that "[a]s a result[ ] of [her]

11   coworkers' termination, [she] . . . fear[ed] . . . losing [her] job because [she] supported the [u]nion."[52]

12   She also stated that "[e]very day that [she] clock[s] in at the start time or time[s] out, [she] feel[s] that

13   [ ] Valdivia will call [her] into her office and . . . fire [her]."[53]   Ivania Rueda stated that she was "afraid

14   to lose [her] job for . . . supporting the [u]nion."[54]   She also reported that she overheard Maria Ramirez

15   and Romana Lopez say they were "afraid to participate in the [u]nion after [their] coworkers were

16   discharged and laid off."[55]

17   Elisa Mayorga testified she heard "Reyna [Artola] say that she [was] afraid she was going to lose

18   her job just like [Mayorga and the others] did"; she also reported hearing Remedios Lopez, Reyna

19

20   [49]*Id.*, Exh. 3 at 443:12-14 (Remedios Lopez Affidavit) (indicating that the attached images of cell
     phone text messages were messages received by her from Warner and that the number listed on the
21   messages is Warner's number); *id.* at 446-47 (text message containing the above quoted text).

22
     [50]*Id.* at 450-51 (text message containing above quoted text).
23
     [51]*Id.* at 452-54 (text message containing above quoted text).
24
     [52]*Id.*, Exh 3 at 409 (Maria Ramirez Affidavit).
25
     [53]*Id.*
26
     [54]*Id.*, Exh. 3 at 361 (Ivania Rueda Affidavit).
27
     [55]*Id.*
28

[Artola], and Maria Ramirez state that they were "afraid to wear the [u]nion shirts now."[56]   On October 30, 2013, Maria Rodriquez indicated that she had the same fears as these employees; she stated that she was "aware that employees ha[d] been fired," said she thought they had been fired "because they supported the [u]nion," and admitted that she feared she "could be next because [she] signed the [u]nion petition."[57]   Likewise, Maria Menjivar stated that "[a]s a result of [the termination of the CNAs], [she] felt that [she] could lose her job for supporting the [u]nion and signing the petition. . . .  [O]ther employees, including Rosa Lopez, [Dafny] Cobar, and Elisa Mayorga commented to [Menjivar] that they felt the same way."[58]

Marcos Salvador and Reyna Artola testified that they both felt they could be fired for supporting the union.[59]   In November 2013, Salvador stated: "Now that so many employees have been fired or laid-off, I feel that I could be next.  I believe that they were let go because they supported the [u]nion."  He also said that after the layoffs in October 2013, "employees stopped attending [u]nion meetings."[60]   More recently, on October 3, 2014, Artola stated that "[r]ight after [Vista] fired the housekeepers, [she] was afraid that [she] would get fired too. . . . After the housekeepers were fired, employees were scared to support the [u]nion because they said they had families to support and they did not want to get fired. [She] heard the following employees say they were afraid to get fired: Marcos Salvador, Kiran [Singh], Diana Hermandez, Yolanda Hernandez, and Maria Ramirez."[61]   She commented that CNA Omela Cuesta signed a union authorization card, "but after the housekeepers were fired, she stopped supporting the [u]nion as well."[62]

---

[56]*Id.*, Exh. 3 at 345 (Elisa Mayorga Affidavit)

[57]*Id.*, Exh. 3 at 392 (Maria Angelica Rodriguez Affidavit).

[58]*Id.*, Exh. 3 at 398-99 (Maria Menjivar Affidavit).

[59]*Id.*, Exh. 3 at 284 (Marcos Salvador Affidavit).

[60]*Id.* at 387:9-16.

[61]*Id.*, Exh. 3 at 474:20-475:9 (Reyna Artola Affidavit).

[62]*Id.* at 475:22-476:2.

### D.      Procedural Background

As noted, the union filed a petition for an election to represent certain of Vista's employees on October 17, 2013.[63]  Between October 18 and December 9, 2013, the union filed fifteen charges against Vista, alleging violations of § 8(a)(1) and (3).[64]  Since November 15, 2013, the Union's petition to be appointed as representative for certain of Vista's employees has been blocked pending the Board's investigation of the charges.[65]

On March 21, 2014, Vista filed a complaint seeking to enjoin the NLRB from enforcing certain investigatory subpoenas.[66]  The action was assigned to this court.  On April 30, 2014, the NLRB filed an application for an order requiring compliance with two administrative subpoenas *duces tecum*.[67]  The case was initially assigned to Judge Stephen Wilson, but was subsequently transferred to this court.[68]  On May 12, 2014, the Board filed a motion to dismiss Vista's complaint for lack of subject matter jurisdiction.[69]  The court granted the NLRB's motion to dismiss on July 7, 2014.[70]  The same day, it granted the NLRB's application to enforce the subpoenas, except to the extent the first subpoena sought information concerning the identity of Vista's shareholders.[71]

On September 26 and October 2, 2014, the union filed two new charges against Vista, alleging

---

[63]*Id.*, Exh. 5 at 763 (Petition for Election dated 10/17/13).

[64]*Id.*, Exh. 1 at 19-47 (Charges).

[65]*Id.*, Exh. 5 at 689 (Corrected Order Postponing Hearing Indefinitely).

[66]Complaint, Case No. CV 14-2193-MMM, Docket No. 1 (Mar. 21, 2014).

[67]Application for Order of Enforcement, Case No. CV 14-3337 MMM, Docket No. 1 (Apr. 30, 2014).

[68]Order re: Transfer, Case No. CV 14-3337 MMM, Docket No. 9 (May 8, 2014).

[69]Motion to Dismiss, Case No. CV 14-2193-MMM, Docket No. 15 (May 7, 2014).

[70]Order Granting Motion to Dismiss and Enforcing in Part Subpoenas, Case No. CV 14-2193-MMM, Docket No. 23 (Jul. 7, 2014) at 42.

[71]*Id.*

1  § 8(a)(1), (3), and (5) violations.[72]  On October 30, 2014, the NLRB issued an order consolidating the

2  cases, filed a consolidated complaint, and noticed a hearing on the consolidated complaint.[73]  The union

3  filed an additional charge against Vista on November 3, 2014, alleging another § 8(a)(1) violation.[74]

4  Vista answered the consolidated complaint on November 12, 2014.[75]  On December 5, 2014, the NLRB

5  issued a second consolidated complaint.[76]  There is presently a hearing before an administrative law

6  judge scheduled for January 20, 2015.[77]

7       **E.    Vista's Evidentiary Objections**

8       Vista has asserted several objections to the evidence petitioner adduced in support of the

9  petition.[78]  The objections generally concern authentication and hearsay, although other grounds are

10  asserted with respect to certain items of evidence.  Petitioner contends that the court can consider its

11  evidence, although possibly inadmissible, in deciding a motion for preliminary injunction.  Petitioner

12  is correct.  It is well established that trial courts can consider otherwise inadmissible evidence in

13  deciding whether or not to issue a preliminary injunction.  See *Univ. of Texas v. Camenisch*, 451 U.S.

14  390, 395 (1981) ("[A] preliminary injunction is customarily granted on the basis of procedures that are

15  less formal and evidence that is less complete than in a trial on the merits"); *Flynt Distributing Co. v.*

16  *Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The Harveys argue that Flynt's evidence is hearsay.  The

17  urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult

18  to obtain affidavits from persons who would be competent to testify at trial.  The trial court may give

19  even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable

20

21       [72]Petition, Exh. 1 at 48-49 (Charges).

22       [73]*Id*., Exh. 2 at 85-101 (Order Consolidating, Consolidated Complaint, and Notice of Hearing).

23       [74]*Id*., Exh. 1 at 50 (Charge).

24       [75]*Id*., Exh. 2 at 69-76 (Answer to Consolidated Complaint).

25

26       [76]*Id.* at 51-66 (Second Consolidated Complaint).

27       [77]*Id.* at 68 (Order Rescheduling Hearing).

28       [78]Vista's Evidentiary Objections ("Objections"), Docket No. 16-4 (Dec. 22, 2014).

harm before trial"). "Indeed, district courts have considerable discretion to consider otherwise inadmissible evidence when ruling on the merits of an application for a preliminary injunction." See *Garcia v. Green Fleet Sys., LLC*, No. CV 14-6220 PSG (JEMx), 2014 WL 5343814, *5 (C.D. Cal. Oct. 10, 2014) (citing *Flynt*, 734 F.2d at 1394; *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (observing that the rules of evidence do not strictly apply to preliminary injunction proceedings)).

This does not mean, however, that issues concerning authentication and hearsay have no relevance at this stage of the proceedings. Such "issues properly go to weight, rather than admissibility." *Id*. See also *Sega Enterprise Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1530 n. 10 (9th Cir. 1992) ("In the absence of any evidence that Nagashima was lying, it was not an abuse of discretion for the district judge to admit his declaration and the altered Accolade cartridges as evidence. The fact that neither Accolade nor the district court was able to verify Nagashima's statements affects the weight to be given the statements and the proffered cartridges, not their admissibility"). Accordingly, the court considers Vista's objections to evidence the court relies upon *infra*.[79]

## II.   DISCUSSION

### A.     Legal Standard Governing Motions for Preliminary Injunctions

"Section 10(j) permits a district court to grant relief 'it deems just and proper.'" 29 U.S.C. § 160(j). *Frankl v. HTH Corp.*, 650 F.3d 1334, 1355 (9th Cir. 2011). "To decide whether granting a request for interim relief under Section 10(j) is 'just and proper,' district courts consider the traditional equitable criteria used in deciding whether to grant a preliminary injunction." *McDermott v. Ampersand Publ'g, LLC*, 593 F.3d 950, 957 (9th Cir. 2010).

"A preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008). Thus, a district court should enter a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S.

---

[79]All objections Vista raises that are not discussed in the text of the order lack merit and are hereby overruled.

7, 22 (2008).  Such a showing requires that the plaintiff establish he "is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter*, 555 U.S. at 20; see *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009) ("Under *Winter*, plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest"); see also *Johnson v. Couturier*, 572 F.3d 1067, 1081 (9th Cir. 2009) ("[P]reliminary injunctive relief is available only if plaintiffs [also] 'demonstrate that irreparable injury is likely in the absence of an injunction,'" quoting *Winter*, 555 U.S. 22);[80] *American Trucking Associations*, 559 F.3d at 1052 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits," citing *Winter*, 555 U.S. at 20); *Timbisha Shoshone Tribe v. Kennedy*, 687 F.Supp.2d 1171, 1182 (E.D. Cal. 2009) ("Pursuant to *Winter*, [p]laintiffs must make a 'clear showing' that they are 'likely to succeed on the merits,'" quoting *Winter*, 555 U.S. at 22).

Following *Winter*, the Ninth Circuit articulated an alternate formulation of the sliding scale

---

[80]Prior to the Supreme Court's decision in *Winter*, the Ninth Circuit held that to prevail on a motion for preliminary injunction, a plaintiff had to demonstrate:

"either: (1) a likelihood of success on the merits and the *possibility* of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor.  These two alternatives represent extremes of a single continuum, rather than two separate tests.  Thus, the greater the relative hardship to the party seeking the preliminary injunction, the less probability of success must be shown."
*Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Clear Channel Outdoor Inc. v. City of L.A.*, 340 F.3d 810, 813 (9th Cir. 2003) (emphasis original)).
The *Winter* Court "definitively refuted" the Ninth Circuit's "possibility of irreparable injury" standard.  *Id.*  It held that the "'possibility' standard [was] too lenient," and that "plaintiffs seeking preliminary relief [have] to demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Winter*, 555 U.S. at 22 (emphasis original).  Following *Winter*, the Ninth Circuit has held that "[t]o the extent that our cases have suggested a lesser standard, they are no longer controlling, or even viable."  *American Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (footnote omitted).  The Ninth Circuit subsequently reaffirmed this in the NLRB context.  See *Frankl*, 650 F.3d at 1355 ("In all cases, however, the Regional Director 'must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction'"); *Small v. Operative Plasterers' and Cement Masons' Int'l Ass'n, Local 200*, 611 F.3d 483, 491 (9th Cir. 2010) (observing, in an NLRB case, that *Winter* overruled prior case law holding that a mere "possibility of irreparable harm" could suffice).

1   test.  Post-*Winter*, serious questions going to the merits and a balance of hardships that tips sharply

2   in favor of the plaintiff can support issuance of a preliminary injunction if plaintiff also shows that

3   there is a likelihood of irreparable injury and the injunction is in the public interest.  *Alliance for the*

4   *Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) ("To the extent prior cases applying

5   the 'serious questions' test have held that a preliminary injunction may issue where the plaintiff

6   shows only that serious questions going to the merits were raised and the balance of hardships tips

7   sharply in the plaintiff's favor, without satisfying the other two prongs, they are superseded by

8   *Winter*, which requires the plaintiff to make a showing on all four prongs. . . .  But the 'serious

9   questions' approach survives *Winter* when applied as part of the four-element *Winter* test.  That is,

10   'serious questions going to the merits' and a balance of hardships that tips sharply towards the

11   plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that

12   there is a likelihood of irreparable injury and that the injunction is in the public interest").

13         If the harm to plaintiff is merely monetary, it "will not usually support injunctive relief."

14   *American Trucking Associations*, 559 F.3d at 1057.  See also *California Pharmacists Association*

15   *v. Maxwell-Jolly*, 563 F.3d 847, 851-52 (9th Cir. 2009) ("Typically, monetary harm does not

16   constitute irreparable harm. . . .  Economic damages are not traditionally considered irreparable

17   because the injury *can later be remedied by a damage award*" (emphasis original)).  In addition,

18   harm that is "merely speculative" will not support injunctive relief, "although a loss of goodwill and

19   reputation can do so." *American Trucking Associations*, 559 F.3d at 1057.

20         As the *Winter* Court noted, "[a] preliminary injunction is an extraordinary remedy never

21   awarded as of right."  *Winter*, 555 U.S. at 55.  "In each case, a court must balance the competing

22   claims of injury and must consider the effect on each party of the granting or withholding of the

23   requested relief."  *Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542 (1987).

24   "In exercising their sound discretion, courts of equity should pay particular regard for the public

25   consequences in employing the extraordinary remedy of injunction."  *Weinberger v.*

26

27

28

1    *Romero-Barcelo*, 456 U.S. 305, 312 (1982).[81]

2    "The plaintiff[ ] bear[s] the initial burden of showing that [issuance of an] injunction is in the

3    public interest." *Stormans*, 586 F.3d at 1139 (citing *Winter*, 555 U.S. 27). The district court "need

4    not consider public consequences that are 'highly speculative.'" *Id.* (quoting *Golden Gate*

5    *Restaurant Association v. City & County of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008)).

6    "In other words, the court should weigh the public interest in light of the likely consequences of the

7    injunction. Such consequences must not be too remote, insubstantial, or speculative and must be

8    supported by evidence." *Id.* "When the reach of an injunction is narrow, limited only to the parties,

9    and has no impact on non-parties, the public interest will be 'at most a neutral factor in the analysis

10   rather than one that favor[s] [granting or] denying the preliminary injunction.'" *Stormans*, 586 F.3d

11   at 1138-39 (quoting *Bernhardt v. Los Angeles County*, 339 F.3d 920, 931 (9th Cir. 2003)). See also

12   *Sierra Forest Legacy*, 577 F.3d at 1022 ("When deciding whether to issue a narrowly tailored

13   injunction, district courts must assess the harms pertaining to injunctive relief in the context of that

14   narrow injunction"). "If, however, the impact of an injunction reaches beyond the parties, carrying

15   with it a potential for public consequences, the public interest will be relevant to whether the district

16   court grants the preliminary injunction." *Id.* at 1139 (citing *Sammartano v. First Judicial District*

17   *Court*, 303 F.3d 959, 965 (9th Cir. 2002)). "[When] an injunction is asked which will adversely

18   affect a public interest . . . the court may in the public interest withhold relief until a final

19   determination of the rights of the parties, though the postponement may be burdensome to the

20   plaintiff." *Weinberger*, 456 U.S. at 312-13.

21   As a threshold matter under *Winter*, the moving party must establish a likelihood of success

22   on the merits of his claims before a court can grant a preliminary injunction. *Winter*, 555 U.S. at 20.

23   As noted, in the Ninth Circuit, this threshold showing can be made by demonstrating that there are

24   serious questions going to the merits of the claims. If the moving party is unable to establish this

25

26   [81]The *Winter* Court stated that "'*consideration of the public interest*' is mandatory 'in assessing
27   the propriety of any injunctive relief.'" *Nelson v. National Aeronautics and Space Administration*, 568
     F.3d 1028, 1050 (9th Cir. 2009) (Kleinfeld, J., dissenting from denial of rehearing en banc) (quoting
28   *Winter*, 555 U.S. at 32 (emphasis original)).

1    element, the request for a preliminary injunction must be denied and the court need not review

2    whether the remaining requirements for issuance of a preliminary injunction are satisfied.   See

3    *Dudum v. City and County of San Francisco*, Case No. 10-00504-RS, 2010 WL 1532365, *11 (N.D.

4    Cal. Apr. 16, 2010); *Jones v. Felker*, Case No. 08-006-FCD-EFB, 2010 WL 582131, *2 (E.D. Cal.

5    Feb. 12, 2010).[82]

6         **B.    Likelihood of Success on the Merits**

7              **1.    Legal Standard Governing Likelihood of Success on the Merits**

8              When considering "a § 10(j) petition, likelihood of success is a function of the probability that

9    the Board will issue an order determining that the unfair labor practices alleged by the Regional Director

10   occurred and that this Court would grant a petition enforcing that order, if such enforcement were

11   sought." *Frankl*, 650 F.3d at1355.  "[I]n evaluating the likelihood of success, 'it is necessary to factor

12   in the district court's lack of jurisdiction over unfair labor practices, and the deference accorded to

13   NLRB determinations by the courts of appeals.'"  *Id*. (quoting *Miller v. California Pac. Med. Ctr*., 19

14   F.3d 449, 460 (9th Cir. 1994)).   "It is, after all, the Board and not the courts, which 'has primary

15   responsibility for declaring federal labor policy.'"  *Id*.  In light of this deference, "it remains the case –

16   whether or not the Board itself approved the filing of the § 10(j) petition – that the regional director in

17   a § 10(j) proceeding 'can make a threshold showing of likelihood of success by producing *some evidence*

18   to support the unfair labor practice charge, together with an arguable legal theory.'"  *Id*. (quoting *Miller*,

19   19 F.3d at 460 (emphasis added)); *Scott v. Stephen Dunn & Associates*, 241 F.3d 652, 662 (9th Cir.

20

---

21         [82]After *Winter*, a district court cannot take an "an all-or-nothing approach to assessing the

22   harms." *Sierra Forest Legacy*, 577 F.3d at 1022.  Instead, it must "address[ ] the options actually

23   on the table." *Id*.  In *Winter*, this meant addressing whether, given the fact that four restrictions on

24   defendant's conduct were already in place, irreparable injury was likely to occur absent an injunction

25   that included two additional restrictions. *Winter*, 555 U.S. at 22-23.  In *Sierra Forest Legacy*, the

26   Ninth Circuit reversed the district court's application of the non-merits injunctive relief factors

27   because it "boiled down to a choice between" allowing the Forest Service to move ahead with a

28   framework developed in 2004 or requiring the Forest Service to take no action at all with respect

     to fire prevention.  The Ninth Circuit held that the district court erred by failing to consider whether

     a narrower injunction, such as one allowing the Forest Service to proceed under an unchallenged

     framework developed in 2001, would have served to prevent otherwise likely irreparable injury.

     *Sierra Forest Legacy*, 577 F.3d at 1022-23.

1    2001) ("[T]o satisfy the 'likelihood of success' prong of the traditional equitable test, [the Director] need

2    only show a better than a negligible chance of success.")).

3    　　　　Conflicting evidence, moreover, "does not preclude the Regional Director from making the

4    requisite showing for a section 10(j) injunction." *Frankl,* 693 F.3d at 1063; *Garcia ex rel. N.L.R.B. v.*

5    *S & F Mkt. St. Healthcare, LLC*, No. CV 12-1773 PA (VBKx) 2012 WL 1322888, *6 (C.D. Cal. Apr.

6    17, 2012) (same); *Baudler v. American Baptist Homes of the West,* 798 F.Supp.2d 1099, 1107-08 (N.D.

7    Cal. July 19, 2011) (finding that respondent employer's evidence disputing the union's assertion that

8    respondent had replaced strikers to teach them a lesson did not preclude the Regional Director from

9    showing a likelihood of success because "if credited by a fact-finder, [the union's] account would

10   demonstrate an improper purpose in hiring permanent replacements.").

11   　　　　**2.　　　Whether Petitioner has Shown a Likelihood of Success on the Merits**

12   　　　　Petitioner contends that overwhelming evidence and well-settled Board law support the unfair

13   labor practices charges.  As a result he asserts that it is likely Vista will be found to have violated

14   sections 8(a)(1), (3), and (5) of the NLRA,[83] and that he has demonstrated a strong likelihood of success

15   on the merits.  The court addresses success on the merits under each section of the NLRA in turn.

16   　　　　　　　**a.　　　Section 8(a)(1)**

17   　　　　Section (8)(a)(1) prohibits employers from interfering with, restraining, or coercing "employees

18   in the exercise of rights guaranteed in 29 U.S.C. § 157 ("§ 7").  29 U.S.C. § 158(a)(1).  Section 157

19   rights include the right of self-organization, the right to form, join, or assist labor organizations, and the

20   right to engage in other concerted activities for the purpose of collective bargaining or other mutual aid

21   protection.  29 U.S.C. § 157.  Petitioner cites a litany of alleged acts, all of which the Board has found

22   violate § 8(a)(1).  There is thus little doubt that petitioner has an arguable legal theory that supports a

23   § 8(a)(1) violation.  The court therefore examines whether the evidence the parties have adduced

24   supports a finding that such violations actually took place.  See *Garcia*, 2014 WL 5343814 at *7

25   (conducting such an analysis).

26   　　　　　　　**(1)　　　Instructing Employees Not to Talk to the Union**

27   

28   　　　　[83]Petition at 18.

　　　　　　　　　　　　　　　　　　　　　　20

1    Petitioner first argues that Vista violated § 8(a)(1) by instructing employees not to talk to union

2 organizers.  As evidence of this, he cites Valdivia's admission under oath that she "learned that there was

3 some kind of union activity going on" by August 8, 2013,[84] and thereafter told at least six employees not

4 to open their homes to union representatives because they might be "thieves."[85]  Vista contends it had

5 no notice of union activity until October 14, 2013, when the union petition was presented to Valdivia.[86]

6 As petitioner notes, however, Valdivia has admitted that she knew "some kind of union activity" was

7 going on as early as August 8, 2013, Vista also contends that Valdivia was acting in good faith when she

8 advised employees that people visiting their homes could be thieves, because the unsolicited house calls

9 began just months after employees' personal information had been stolen from Vista.[87]  The court does

10 not find this argument credible.

11    Valdivia's self-serving declaration, moreover, is entitled to little weight.  See *N.L.R.B. v. Pac.*

12 *Grinding Wheel Co.*, 572 F.2d 1343, 1347 (9th Cir. 1978) ("It is also well established that the Board

13 need not treat self-serving declarations of an employer as conclusive, even if not contradicted by any

14 direct testimony in the record").  Marcos Salvador reported that Valdivia told five Vista employees

15

16

---

17    [84]*Id.*, Exh. 3 at 513:22-23 (Rosa Valdivia Affidavit) ("[E]mployees stated reporting to me various

18 incidents [and on] 8/8/13 I learned that there was some kind of union activity going on").

19    [85]*Id.*, Exh. 3 at 381 (Marcos Salvador Affidavit, ¶ 14) ("Rosa Valdivia called a meeting of

20 employees.  It took place in the hallway to the right of the nurse's station.  There was Renya Artola,
Kiran [Singh], Remedios Lopez, Jeanette Aguillera, and myself.  Ester [Cuellar] was there also.

21 Valdivia did the speaking. . . .  She said that we needed to be careful because there were some thieves
visiting houses because they had stolen some documentation from her including all the employee

22 information.  She said that they would identify themselves as from the [u]nion.  She said this was not
true and they were actually thieves. . . .  She said that we should not open our doors because they would

23 look at everything we had so that they could steal it").  See also *id.*, Exh. 3 at 497 (Rosa Lopez Affidavit,
¶ 16) ("I think the Employer had a general idea that there was some union organizing going on. . . .  [A]

24 few days after the Union visited me, Rosa Valdivia called me. . . .  She told me that she heard people
were visiting employees at their homes.  She said that I should not let them in because they might be

25 thieves.  She did not mention the word union").

26    [86]Opposition at 17.

27    [87]Valdivia Decl., ¶ 9 ("I reminded the employees of the theft of the 1-9 book, and told them to

28 be careful and not to open their doors if they didn't want to").

1   "thieves" would visit them and "would identify themselves as from the [u]nion."[88]  Vista has proffered

2   no evidence indicating or inferring that union organizers stole employees' personal information from

3   Vista, nor has it suggested any reasonable basis on which such an inference could be drawn.  Looking

4   at the totality of the circumstances, the evidence strongly suggests that Valdivia attempted to dissuade

5   Vista employees from talking to union organizers; this constitutes interference with their § 7 right to

6   engage in self-organization, to join a labor organization, and to take part in other concerted activities.

7    Indeed, several circuit courts have found that comparable conduct violates § 8(a)(1).  See *Bally's Park*

8   *Place, Inc. v. N.L.R.B.*, 646 F.3d 929, 934 (D.C. Cir. 2011) (observing that there was no dispute that §

9   8(a)(1) had been violated where an employer told an employee "not to talk about the union and

10  [solicited] grievances and promis[ed] to remedy them in order to dissuade employees from supporting

11  the union"); *Dorsey Trailers, Inc. v. N.L.R.B.*, 233 F.3d 831, 838 (4th Cir. 2000) (holding that an

12  employer violated § 8(a)(1) when it "told workers not to talk to the union during working hours without

13  a supervisor's approval").  The court therefore finds that petitioners have adduced some evidence that

14  supports a finding Vista violated § 8(a)(1) by telling its employees that people who came to their homes

15  and introduced themselves as union organizers were thieves and that the employees should not open their

16  doors to them.

17                     **(2)      Interrogation and Polling**

18          Petitioner next asserts that Vista violated § 8(a)(1) by polling and interrogating employees about

19  their union activities and sympathies.   As respects polling, petitioner contends that Vista polled

20  employees by preparing a form that it gave to employees and asked that they state whether they had

21  voluntarily signed the union petition.   Vista disputes this finding; it contends that the letter was not a

22  poll because employees were not forced to return it.[89]  This argument is unavailing.  Determining the

23  "kind of employer actions [that] constitute a 'poll' does not depend on their formal nomenclature; the

24  key is their practical effect of tending to instill in employees a reasonable belief that the employer is

25  trying to find out whether they support or oppose the union." *Allegheny Ludlum Corp. v. NLRB*, 104 F.3d

26  —————————————

27          [88]*Id.*, Exh. 3 at 381 (Marcos Salvador Affidavit, ¶ 14).

28          [89]Opposition at 18.

1354, 1360 (D.C. Cir. 1997).  This happens whenever "the employees are forced to make an observable choice that demonstrates their support for or rejection of the union." *Allegheny Ludlum Corp. v. N.L.R.B.*, 301 F.3d 167, 175-76 (3d Cir. 2002) (quoting *Barton Nelson, Inc.*, 318 N.L.R.B. 712, 712 (1995)).  Here, there is no question that the questionnaire forced employees to make an observable choice that demonstrated their support for or rejection of the union.

Vista contends that employees were not required to return the form; no evidence supports this assertion, and it is belied by employee testimony.[90]  Romana Lopez testified that "[b]ased on what [Valdivia] told [her] [she] felt that [she] had to sign the letter or [she] would get in trouble."[91]  The court therefore concludes that petitioner has adduced some evidence supporting a plausible legal argument that the letter was a poll, and employs the NLRB's polling framework to analyze whether a violation occurred.

"[A]ny attempt by an employer to ascertain employee views and sympathies regarding unionism generally tends to cause fear of reprisal in the mind of the employee if he replies in favor of unionism and, therefore, tends to impinge on his Section 7 rights."  *Struksnes Constr. Co.*, 165 NLRB 1062 (1967).  See also *Mingtree Rest., Inc. v. N.L.R.B.*, 736 F.2d 1295, 1297 (9th Cir. 1984) (observing that "[i]n *Struksnes Construction Co., Inc.*, 165 N.L.R.B. 1062 (1967), the Board adopted guidelines for employer polling of employee union sentiment during a union's initial demand for recognition" and applying *Struksnes*), disapproved on other grounds in *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 364(1998).  In *Struksnes*, the Board concluded that "a poll taken while a petition for a Board election is pending does not . . . serve any legitimate interest of the employer that would not be

_____

[90]*Id.*, Exh. 3 at 481 (Romana Lopez Affidavit) (stating that Valdivia handed her the letter on October 20, 2013, and that after she failed to return it, Valdivia talked to her on October 22 or 23, and said she "had to sign the letter"); *id*. ("I could not understand [the letter] because I don't read or speak English. . . .  I told her the Union did not force me to sign anything. . . . Based on what she told me I felt that I had to sign the letter or I would get in trouble.  I could not read the letter at all, so Rosa Valdivia, who had a copy with [her], pointed out where I should sign").  Petitioner has proffered the letter signed by Romana Lopez, and it appears Valdivia had her sign on the line indicating that she *did not* voluntarily sign the union petition, despite the fact that she told Valdivia that she voluntarily executed the document. (See *id*., Exh. 5 at 693 (Form Signed by Romana Lopez on October 21, 2013).)

[91]*Id.*

23

1   better served by the forthcoming Board election.  In accord with long-established Board policy,

2   therefore, such polls [ ] continue to be found violative of Section 8(a)(1) of the [NLRA]."  *Struksnes*,

3   165 NLRB at 1063.

4       Petitioner contends that Vista's polling was *per se* unlawful under *Struksnes*, because it took

5   place between October 17 and 21, 2013, after the union had presented its petition to Valdivia on October

6   14, 2013, and while a petition for a Board election – filed October 17, 2013 – was pending.[92]  The court

7   agrees.  Romana Lopez stated that Valdivia gave her an envelope on which her name was printed, which

8   contained a document asking whether she had voluntarily signed the union petition.[93]  This took place

9   on October 20, 2013, six days after the petition was presented to Valdivia, and three days after the

10  petition for a Board election was filed.  Vista, in fact, admitted in its response to charges filed with the

11  Board that it circulated the polling form to *all employees* to determine whether they had voluntarily

12  signed the union petition.[94]  It contends the form was circulated in response to "complaints of coercion

13  and harassment to sign some documents by [u]nion organizers."[95]  Vista cites no evidence of harassment

14  or coercion, however, nor any evidence that any employee who signed the union petition or an

15  authorization card did not do so voluntarily.  Vista's unsupported assertion, therefore, is entitled to no

16  weight.  Even were the court to credit Vista's description of the "motive" for the polling, moreover, it

17  does not change the fact that the form sought information as to whether employees supported or opposed

18  the union while a petition for a Board election was pending.  That is precisely what *Struksnes* prohibits.

19  See 165 NLRB at 1063 ("a poll taken while a petition for a Board election is pending does not . . . serve

20  any legitimate interest of the employer that would not be better served by the forthcoming Board

21  election.  In accord with long-established Board policy, therefore, such polls [ ] continue to be found

22

23       [92]*Id.*, Exh. 5 at 782 (Petition for Board Election dated 10/17/2013).

24       [93]*Id.*, Exh. 3 at 481 (Romana Lopez Affidavit) (stating that Valdivia handed her the polling letter
25  on October 20, 2013, and that after she failed to return it, Valdivia spoke to her on October 22 or 23, and
    said she "had to sign the letter").

26       [94]*Id.*, Exh. 5 at 704 (Vista's Response to Charges, ¶ 2) ("[E]mployer prepared a form and offered
27  it to all employees to allow them to express their concerns in writing so that the employer could help").

28       [95]Opposition at 18.

                                                    24

1   violative of Section 8(a)(1) of the [NLRA]").  The court therefore finds that petitioner has provided some

2   evidence that employees were polled, and that the poll took place while a petition for Board election was

3   pending; accordingly, *Struksnes* dictates that the poll "be found violative of Section 8(a)(1) of the

4   [NLRA]." *Id.*

5       "An employer can also violate Section 8(a)(1) by improperly interrogating employees about their

6   union activities." *Garcia*, 2014 WL 5343814 at *13 (*Southwire Co.*, 282 N.L.R.B. 916, 917 (1987)).

7   The test for evaluating if an interrogation violates § 7 is "whether under all the circumstances the

8   interrogation reasonably tends to restrain, coerce, or interfere with rights guaranteed by the Act." *Id.*

9   (citations omitted).[96]

10      Petitioner has adduced evidence that on October 18, 2013, Valdivia asked Genaro Meza if he

11  knew what he had signed when he signed the petition, if he knew what he was doing, and what the union

12  had promised him in return.[97]  After he explained that he and others wanted someone to represent them,

13  Valdivia said that "the trust had ended" and that he had "betrayed her."[98]  This is strong evidence that

14  Valdivia interrogated Meza.  Vista counters that, as reflected in her declaration, Valdivia never met with

15  Meza.[99]  The court, however, finds Meza's statements more credible, particularly because other

16

---

17      [96]As the *Allegheny Ludlum* court noted, it has not always been clear where the Board draw the
18  line between "polling" and "interrogation."  *Allegheny Ludlum Corp.*, 104 F.3d at 1359.  It stated,
    however, that "[i]n general, suspicious employer actions are addressed under the rubric of 'interrogation'
19  when they are directed at individual employees, and when they involve isolated incidents or spontaneous
    casual interactions between employees and agents of the employer; a 'polling' analysis, on the other
20  hand, is reserved for situations where the employer's actions have a broader, more systematic and more
    deliberate character." *Id.* at 1359-60.
21

22      [97]*Id.*, Exh. 3 at 350:16-23 (Genaro Meza Affidavit, ¶ 16) ("Probably on October 18[,] [i]t was
    just me and [Valdivia] in her office.  She asked me what it was that I was doing.  I said about what.  She
23  asked if I knew what I had signed and if I knew what I was doing.  She asked me what the men were
    promising us.  I said that I did not know.  I said that we wanted someone to represent us because
24  whenever we came to her office she would never want us to express ourselves or our opinions").

25      [98]*Id.* ("She said the trust had ended.  She said that she did not trust me anymore because I
26  betrayed her").

27      [99]Declaration of Rosa Valdivia ("Valdivia Decl."), Docket No. 16-2 (Dec. 22, 2014), ¶ 7
    ("Petitioner alludes to a conversation I had with Genaro Meza saying that I interrogated him regarding
28  the Union and made t[h]reats to him, and that I didn't trust him because of his sympathy to the Union.

employees, such as Romana Lopez, have testified that Valdivia approached them and asked questions about their union sympathies.[100]  The court therefore finds that petitioner has adduced some evidence that Valdivia interrogated Meza in violation of § 8(a)(1).  See *L'Eggs Products, Inc. v. N.L.R.B.*, 619 F.2d 1337, 1346 (9th Cir. 1980) ("Although it is not an unfair labor practice for an employer to inform employees that they have a right to revoke their union support, it is an unfair labor practice actively to solicit revocations in an otherwise coercive atmosphere").  This evidence also supports a finding that Vista violated § 8(a)(1) because Valdivia equated support of the union with betrayal.  See *Hialeah Hosp.*, 343 NLRB 391, 391 (2004) ("Thus, as the judge found, Linares violated Section 8(a)(1) by telling the employees that he felt 'betrayed' and 'stabbed in the back' because they had contacted the Union. Those statements conveyed to the employees the message that engaging in union activity, a protected statutory right, was tantamount to employee disloyalty, and implicitly threatened them with unspecified reprisals").

There is additional evidence that interrogations occurred as well.  Rosa Lopez testified that on October 21, Valdivia asked whether she had been forced to sign the union petition, and promised her that she could keep her job as long as she wanted if she signed a document stating that she had signed the petition involuntarily.[101]  Lopez also stated that Valdivia remarked in a separate conversation on October 18, 2013, that Lopez was "trust[ing] people who [she] d[id] not know," and asked her about what "the[ union organizers] [were] offering you all."[102]   Petitioner contends this is further evidence of interrogation, especially because it took place without anyone else present and without any assurances

---

I never had such conversations with Mr. Me[z]a").

[100]Petition, Exh. 3 at 481 (Romana Lopez Affidavit, ¶ 17) ("On October 22 or 23, during work, Rosa Valdivia approached me by myself . . . .  She asked if I understood the letter.").

[101]*Id.*, Exh. 3 at 500 (Rosa Lopez Affidavit) ("On October 21, . . . [Valdivia] took me over to the office. . . .  It was just us.  She told me to open the envelope [containing the polling letter].  She asked if I wanted her to read it to me.  She read it to me in Spanish.  After she read it she said that since she was our Employer she cared about us and she wanted to know if we had been forced to sign the petition. She said that if I had been forced, I should sign that I was forced.  She said that if I signed that I was forced I would have my job as long as I wanted it").

[102]*Id.*

26

that the information would not be used against Lopez. Vista counters that Valdivia denies she told Lopez she could keep her job if she signed a document stating that she had been forced to sign the petition.[103] There is no evidence of Valdivia's purported denial, however. Accordingly, petitioner adduced some evidence suggesting that Lopez was interrogated and/or coerced by Valdivia, and hence that Vista violated § 8(a)(1). See *N.L.R.B. v. Sky Wolf Sales*, 470 F.2d 827, 829 (9th Cir. 1972) ("Section 8(a)(1) of the Act makes it unlawful for an employer to instigate and promote a decertification proceeding or induce employees to sign any other form of union-repudiating document, particularly where the solicitation is strengthened by express or implied threats of reprisal or promises of economic benefit," quoting *N.L.R.B. v. Birmingham Publishing Co.*, 262 F.2d 2, 7 (5th Cir. 1958)); see also *L'Eggs Products, Inc.*, 619 F.2d at1346 ("Although it is not an unfair labor practice for an employer to inform employees that they have a right to revoke their union support, it is an unfair labor practice actively to solicit revocations in an otherwise coercive atmosphere").

In sum, the court finds that petitioner has adduced credible evidence that Vista violated § 8(a)(1) by polling and interrogating its employees about their union involvement and support, and by otherwise attempting to solicit revocations of union support in a coercive atmosphere.

### (3) Impression of Surveillance

"The Board has also found that an employer violates the NLRB by maintaining 'surveillance of the meetings and meeting places of [the union] and of the activities of . . . employees in connection with [the union].'" *Garcia*, 2014 WL 5343814 at *12 (quoting *Pennsylvania Greyhound Lines, Inc.*, 1 N.L.R.B. 1, 48 (1935)). "In determining whether an employer's statement has created an unlawful impression of surveillance, the test is 'whether the employees would reasonably assume from the statement that their union activities had been placed under surveillance.'" *Id.* (citing *Bridgestone Firestone,* 350 N.L.R.B. 526, 529 (2007)).

Petitioner argues that Valdivia created an impression of surveillance when she questioned Ramirez prior to the presentation of the petition on October 14, 2013. Ramirez testified that she was

---

[103]Opposition at 20.

1   called into Valdivia's office and asked if "they had looked for [her] again."[104]   Ramirez understood

2   "they" "referr[ed] to the [u]nion."[105]   Valdivia said that "she kn[ew] who they were," and that Ramirez

3   "had to tell her what was going on and what [ ] the cards that [were] being circulated [were about]."[106]

4   Ramirez stated that Valdivia never "explained what she was referring to when she said that they had

5   already told her or [to] whom she was referring."[107]

6        The court agrees that Ramirez's comments constitute "some evidence" that Vista created an

7   impression of surveillance.   The standard used to determine whether conduct constitutes surveillance

8   is an objective one, based on the rationale that "employees should be free to participate in union

9   organizing campaigns without the fear that members of management are peering over their shoulders,

10  taking note of who is involved in union activities, and in what particular ways." *Flexsteel Industries*,

11  311 NLRB 257, 257 (1993).   Here, Valdivia communicated to Ramirez on October 14, 2013, that she

12  knew union organizing taking place and that authorization cards were being circulated; this was before

13  the petition was presented.   Valdivia did not reveal the source of this information.   "When an employer

14  tells employees that it is aware of their union activities, but fails to tell them the source of that

15  information, the employer violates Section 8(a)(1).   This is because employees are left to speculate as

16  to how the employer obtained its information, causing them reasonably to conclude that the information

17  was obtained through *employer* monitoring." *In Re Stevens Creek Chrysler Jeep Dodge, Inc.*, 353 NLRB

18  1294, 1296 (2009) (citing *North Hills Office Services*, 346 NLRB 1099, 1103 (2006); *Conley Trucking*,

19  349 NLRB 308, 315 (2007); *Dallas & Mavis Specialized Carrier Co.*, 346 NLRB 253, 254 (2006)).[108]

20

21        [104]*Id.*, Exh. 3 at 403 (Maria Ramirez Affidavit).

22        [105]*Id.*

23        [106]*Id.*

24        [107]*Id.*

25

26        [108]"By contrast, when an employer tells employees that it learned of their union activities from
another employee, or when those activities are overt such that employees would not reasonably conclude

27  that the employer learned of them through surveillance, the Board has found no violation." *Stevens
Creek Chrysler Jeep Dodge, Inc.*, 353 NLRB at 1296; *Park N Fly, Inc.*, 349 NLRB 132, 133 (2007).

28  Vista does not suggest that Valdivia learned this information from an employee, nor does there appear

1    Accordingly, the court finds that petitioner has proffered some evidence that Vista created an impression

2    of surveillance in violation of § 8(a)(1).

3          Vista disputes this, arguing that employees presented the petition to Valdivia a mere half hour

4    after this conversation took place, and that Valdivia had received calls from employees before the

5    conversation regarding the union.  This argument is unpersuasive.  An employer violates the § 8(a)(1)

6    by creating the *impression* of surveillance.  How Valdivia in fact learned of employees' efforts to

7    unionize is not relevant.  What matters is the impression her statements to Ramirez objectively

8    conveyed.  During the conversation with Ramirez, Valdivia did not say that she learned of the union

9    activity from other employees,[109] or from any particular source; rather, Valdivia left Ramirez "to

10   speculate as to how [Vista] obtained its information, causing [her] reasonably to conclude that the

11   information was obtained through *employer* monitoring."  *Stevens Creek Chrysler Jeep Dodge, Inc.*, 353

12   NLRB at 1296.

13         The court therefore finds that petitioner has adduced some evidence that Vista engaged in

14   conduct that created an impression of surveillance in violation of § 8(a)(1).

15               **(4)       Promise of Greater Job Security to Rosa Lopez**

16        "An employer's promise of benefits during a preelection campaign violates Section 8(a)(1)."

17   *Dyncorp & Grant Turner*, 343 NLRB 1197, 1198 (2004) (citing *Bakersfield Memorial Hospital*, 315

18   NLRB 596, 600 (1994)).  This is because "[s]uch promises made in the course of urging employees to

19   reject unionization are unlawful because they link improved conditions to defeat of the union."  *Id*.

20   (citing *Reliance Electric Co.*, 191 NLRB 44, 46 (1971), enfd. 457 F.2d 503 (6th Cir. 1973)).  The use

21   of "cautious language or even a refusal to commit . . . to specific corrective action, does not cancel the

22   employees' anticipation of improved conditions if the employees oppose or vote against the unions."

23   *Id*.  See also *Superior Emerald Park Landfill, LLC*, 340 NLRB 449, 460 (2003) ("[T]he fact that an

24

---

25   to be any evidence before the court to corroborate such an assertion.

26        [109]This would not create an impression of surveillance.  *North Hills Office Services*, 346 NLRB

27   at 1103-04 ("Volunteering information concerning an employee's union activities by other employees

28   such as occurred here, particularly in the absence of evidence that management solicited that

       information, does not create an impression of surveillance").

1  employer couches the promises of benefits in language that does not guarantee anything specific does

2  not remove the taint of illegality").

3  　　　Petitioner has adduced evidence that Valdivia told Rosa Lopez that if she signed a document

4  stating that she was forced to sign the union petition she "would have [her] job as long as [she] wanted

5  it."[110]   Petitioner argues, and the court agrees, that this statement is much more than a promise to

6  maintain the status quo; indeed, it constitutes an absolute promise of ongoing future employment in

7  exchange for rejecting unionization.  Accordingly, petitioner has adduced some evidence that supports

8  a finding that Vista violated § 8(a)(1) by promising benefits in exchange for rejecting the union.  See

9  *Fabric Warehouse*, 294 NLRB 189, 191 (1989) (finding a § 8(a)(1) violation where "Respondent told

10  the employees they *would receive* a certain package of benefits that combined some of the best elements

11  of both the union and the nonunion benefits it currently provided its employees, thus offering them a

12  better set of benefits than either their own or the nonunion employees' current benefits" (emphasis

13  original)), enfd. *Hancock Fabrics v. N.L.R.B.*, 902 F.2d 28 (4th Cir. 1990); see also *N. L. R. B. v. Exch.*

14  *Parts Co.*, 375 U.S. 405, 409 (1964) ("We have no doubt that [Section 8(a)(1)] prohibits not only

15  intrusive threats and promises but also conduct immediately favorable to employees which is undertaken

16  with the express purpose of impinging upon their freedom of choice for or against unionization and is

17  reasonably calculated to have that effect").

18  　　　　　**(5)　　　Limiting Employee Access to Vista Premises**

19  　　　In *Tri–County Medical Center,* the Board found that "except where justified by business reasons,

20  a rule which denies off-duty employees entry to parking lots, gates, and other outside nonworking areas

21  will be found invalid."  222 NLRB 1089, 1090 (1976); see also *Meijer, Inc. v. N.L.R.B.*, 463 F.3d 534,

22  544 (6th Cir. 2009) (holding that an employer could not prohibit union solicitation and distribution in

23  a driver check-in area because the area was a mixed-use area as employees were "free to talk, read

24  newspapers and magazines, or stand around until their assigned driving time"); *Garcia*, 2014 WL

25  5343814 at *15 (citing and applying *Tri-County*).

26  　　　Petitioner cites evidence that after the petition was presented to her, Valdivia – who appeared

27  _____

28  　　　[110]Petition, Exh. 3 at 500 (Rosa Lopez Affidavit, ¶ 27).

"very upset and angry" – told all off-duty employees to "leave the premises."[111]   Petitioner contends that this was a departure from ordinary practice, as previously "[t]here [had been] no problem" with employees coming to the facility on their days off.[112]   Vista counters that it has always allowed off-duty employees to be present at the facility during working hours, and that it continues to do so.[113]   It contends Valdivia asked the employees to leave only because they were being loud and repeatedly shouted "we are in" in a nursing home that cares for ill and elderly patients.[114]   It also argues that "some aggressive comments were made," but does not identify what these comments were or to whom they were directed.

Although Valdivia states in her declaration that some aggressive comments were made, she indicates – both in the declaration and in an earlier November 13, 2013 response – that she "told [them] to leave the building," and that *"[a]s they were leaving the building*, the guy who was with them was yelling 'we're in, we're in!'"[115]   Valdivia's November 2013 statement does not mention aggressive comments in any way.   It merely reports that charge nurse Trisha Flora stated the "she felt scared because the people came in very aggressively."[116]   Taken together, the evidence cited by Vista does not credibly suggest that Valdivia had knowledge of any threats made by the off-duty employees and union organizers at the time she ordered them to leave the premises; rather, it makes clear that the loud chants occurred after Valdivia asked them to leave.

---

[111]*Id.,* Exh. 3 at 341:3-5 (Elisa Mayorga Affidavit).   Valdivia's demand that employees engaged in organizing activity leave "the premises" reasonably suggests that employees were required to leave all areas, including outside, non-work areas such as the parking lot.   Vista does not contend otherwise.

[112]*Id.,* Exh. 3 at 519:19-21 (Rosa Valdivia Statement) ("Sometimes, employees would come to the facility on their days off . . . .   There was no problem with this").

[113]Opposition at 21.

[114]*Id.*   See also Valdivia Decl., ¶ 8  ("I was called by a group of people to come to the lobby and I went.   I noticed some of our employees were a part of the group.   There were some others who were not our employees . . . .   I asked them to leave.   As they were all leaving they were shouting things to each other and chanting 'we are in', 'we are in' loud").

[115]Petition, Exh. 3 at 519 (Rosa Valdivia Statement).   See also Valdivia Decl., ¶ 8 ("I asked them to leave.   As they were all leaving they were shouting things to each other and chanting 'we are in', 'we are in' loud").

[116]Petition, Exh. 3 at 519:27-28 (Rosa Valdivia Statement).

1    More fundamentally, "because the [c]ourt need not decide whether [Vista], in fact, [ordered the

2    employees to leave] in response to a [u]nion campaign, but [rather] whether [p]etitioner has provided

3    some evidence that it did, the [c]ourt finds that [p]etitioner has met [his] burden." *Garcia*, 2014 WL

4    5343814, at *16.

5

6                    **(6)      Stricter Enforcement of Dress Code Effectively Prohibiting**

7                             **Union Insignia**

8    Petitioner next argues that Vista violated § 8(a)(1) by more strictly enforcing its dress code after

9    union activity began.  It is well established that an employee's right to wear union insignia while at work

10   is protected by the NLRA.  *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 795-804 (1945).  "The

11   Board has held that, in the absence of 'special circumstances,' an employer's prohibition of or limitation

12   on the display of union insignia violates Section 8(a)(1)."  See *Albis Plastics & United Steelworkers of*

13   *Am.*, 335 NLRB 923, 924 (2001) (quoting *Ohio Masonic Home*, 205 NLRB 357, 357 (1973), enfd.511

14   F.2d 527 (6th Cir. 1975)).  Thus, "a rule which curtails that employee right is presumptively invalid

15   unless special circumstances exist which make the rule necessary to maintain production or discipline,

16   or to ensure safety." *Kendall Co.*, 267 NLRB 963, 965 (1983).  "In cases where the employer argues that

17   special circumstances justify a ban on union insignia, the Board and courts balance the employee's right

18   to engage in union activities against the employer's right to maintain discipline or to achieve other

19   legitimate business objectives, under the existing circumstances." *Albis Plastics & United Steelworkers*

20   *of Am.*, 335 NLRB at 924 (citing *Standard Oil Co. of California*, 168 NLRB 153, 161 (1967)).

21   Sometime during the week of October 14, 2013, following presentation of the union petition,

22   Valdivia held a meeting with housekeeping department employees.  At the meeting, she said that Vista

23   intended to enforce its dress code more strictly, prohibiting "uniforms with any type of logos on them."[117]

24   _____

25   [117]*Id.*, Exh. 3 at 314-15 (Dafny Cobar Affidavit) ("Valdivia also said something with respect to
     not wanting uniforms with any type of logos on them. . . .  Before the meetings that took place during
26   the week of October 14, I also do not remember any type of rule regarding uniforms").  See also *id.* at
     341:17-18 (Elisa Mayorga Affidavit) (noting that a "paper" from Vista indicated that Vista "did not want
27   [employees] to wear any shirts that have letters on them," and stating that "[i]n the past, [she] [was] not
28   aware of any rule that employees could not wear shirts with letters on them").

1   Dafny Cobar testified that she did not "remember any type of rule regarding uniforms" previously, as

2   did Eliza Mayorga.[118]  Vista asserts that it changed the dress code because employees were wearing "any

3   t-shirt" and "this was not promoting a professional atmosphere"; it also underscores that "at no time was

4   the [u]nion or its insignia mentioned during the meeting."[119]  The fact that the union was not explicitly

5   mentioned during the meeting is irrelevant; what matters is whether the rule has the effect of curtailing

6   employees' ability to wear union insignia.  See *Kendall Co.*, 267 NLRB at 965 ("a rule which curtails

7   [the] right is presumptively invalid unless special circumstances exist which make the rule necessary to

8   maintain production or discipline, or to ensure safety").[120]  The court need not decide whether the dress

9   code change was motived by a desire to promote a professional atmosphere or by a desire to ban union

10  insignia, because it need only determine whether petitioner has adduced some evidence to support his

11  allegation that a violation occurred.  Petitioner has, in fact, adduced some evidence that Vista banned

12  logos in order to prohibit union insignia in violation of § 8(a)(1), and thus has satisfied its burden

13  respecting this purported violation.

14          **(7)        Threats of Unspecified Reprisals**

15          Employer statements that "reasonably convey[ ]to [an employee] that he would be jeopardizing

16  his job security and current wage rate by supporting [a] [u]nion" violate § 8(a)(1). See *Metro One Loss*

17  *Prevention Servs. Grp. (Guard Div. Ny), Inc. & Allied Int'l Union*, 356 NLRB No. 20, 2010 WL

18  _____

19      [118]*Id.*, Exh. 3 at 314 (Dafny Cobar Affidavit) ("Before the meetings that took place during the
    week of October 14, I also do not remember any type of rule regarding uniforms").  See also *id*. at
20  341:17-18 (Elisa Mayorga Affidavit) (noting that "[i]n the past, [she] [was] not aware of any rule that
    employees could not wear shirts with letters on them").

21
22      [119]Opposition at 23.

23      [120]Vista does not contend that "special circumstances" warranted banning insignia.  Nor do its
    arguments support such a finding.  Even crediting Vista's assertion that the ban was intended to promote
24  a professional environment, it cites no authority for the proposition that an employer's desire to maintain
    a professional workplace justifies an outright ban on logos or insignia.  See *Albis Plastics & United*
25  *Steelworkers of Am.*, 335 NLRB at 924 ("In cases where the employer argues that special circumstances
    justify a ban on union insignia, the Board and courts balance the employee's right to engage in union
26  activities against the employer's right to maintain discipline or to achieve other legitimate business
    objectives, under the existing circumstances").  Given that Vista contends the rule was intended to
27  prohibit the wearing of unprofessional t-shirts, moreover, it is obvious that less drastic alternatives were
28  available.

1   4762307, *1 (Nov. 8, 2010) (citing *Liberty House Nursing Homes,* 245 NLRB 1194, 1198-1199 (1979)

2   (employer unlawfully threatened employees with more onerous working conditions by, among other

3   things, stating that "if the Union came in, times would be even worse").

4           Petitioner cites evidence that assistant director Ester Cuellar told Meza that Valdivia was "well

5   prepared" for a union campaign and that the employees "should all be careful."[121]   This evidence

6   supports a finding that Vista impliedly threatened an unspecified reprisal, given that the statement was

7   apparently made approximately a week after the union petition was presented.   See *Gaetano &*

8   *Associates Inc.*, 344 NLRB 531, 534 (2005) ("Supervisor Sammy Superville cautioned Logan to 'be

9   careful talking to him,' referring to Union Agent Anthony Williamson. . . .   The Board has held that such

10  'be careful' warnings convey the threatening message that union activities would place an employee in

11  jeopardy.   We accordingly find that the Respondent violated Section 8(a)(1) of the Act by threatening

12  Scan Logan"), enfd. 183 Fed. Appx. 17 (2d Cir. May 16, 2006) (Unpub. Disp.);   *St. Francis Medical*

13  *Center*, 340 NLRB 1370, 1383-1384 (2003) (holding a "be careful" statement by a supervisor in context

14  of union activity unlawful); *Jordan Marsh Stores Corp.*, 317 NLRB 460, 462 (1995) (supervisor's

15  statements such as "watch out" are unlawful implied threats).

16          Vista reiterates its contention that Valdivia never spoke to Meza.   As noted, however, the court

17  does not find Valdivia's blanket denial that she had a conversation with Meza credible.   As a result, it

18  finds that petitioner has adduced some evidence that Cuellar made threats of unspecified reprisals in

19  violation of § 8(a)(1).

20                  **(8)      Threats of Closure of Facility for Engaging in Union Activity**

21          Section 8(a)(1) is violated when an employer "threaten[s] a plant closure in response to its

22  employees' union activity."  *Garcia*, 2014 WL 5343814, at *8 (citing *Hertzka and Knowles v. N.L.R.B.,*

23  503 F.2d 625, 627 (9th Cir. 1974)).   Thus, "[i]f there is 'any implication that an employer may or may

24  not take action solely on its own initiative for reasons unrelated to economic necessities and known only'

25  to the company, the statement is considered a threat and is a violation of Section 8(a)(1)."   *Id.* at *8

26

27          [121]*Id.*, Exh. 3 (Genaro Meza Affidavit) at 352; see also *id.* (stating Cuellar went so far as to say

28  that she "felt sorry for [the employees] because Valfivia was so well-prepared against [them]").

1    (quoting *Hertzka and Knowles,* 503 F.2d at 627).

2         Petitioner asserts that Vista threatened a plant closure when, in an October 9, 2014 letter to the

3    NLRB, Vista's lawyer stated that the entire facility might be forced to close if the employees were

4    unwilling to accept the company's settlement offers.[122]   Petitioner contends the lawyer's comments

5    constituted a threat that if Vista employees did not cease efforts to organize a union, the company would

6    close the facility.   The court cannot agree.   As the Supreme Court explained in *NLRB v. Gissel Packing*

7    *Co.*, 395 U.S. 575 (1969), an employer is "free to communicate to his employees any of his general

8    views about unionism or any of his specific views about a particular union' so long as the

9    communications do not contain a 'threat of reprisal or force or promise of benefit.'"   395 U.S. 575

10   absent a threat.   *Id.* at 618.   The employer "may even make a prediction as to the precise effects he

11   believes unionization will have on his company."   *Id.*   The prediction, however, "must be carefully

12   phrased on the basis of objective fact to convey [the] employer's belief as to demonstrably probable

13   consequences beyond his control or to convey a management decision already arrived at to close the

14   plant in case of unionization."   *Id.*   Communicating a belief "'that unionization will or may result in the

15   closing of the plant is not a statement of fact unless, which is most improbable, the eventuality of closing

16   is capable of proof.'"   *Id.* at 618-19.

17        The October 2014 letter is an offer of compromise, which states:

18        "We strongly suggest that the Board ensure that the employees are aware of these offers

19        and that they have a say in the decision.   They may not like the alternative.   Along the

20        same lines, during out meeting you made comments that in case of a sale of the facility,

21        the potential buyers will have to be notified of the potential liabilities.   My Client is

22        aware of the need of said Notification and as such, the sale of the company to anyone

23        under the circumstances which the Board has caused, is rather limited.   Therefore, the

24        only alternative [Vista] will have is to close down its facility.   In such a situation, at least

25        65 patients will lose the services and the remaining of the 60 employees will lose their

26

27        [122]*Id.*, Exh. 5 at 770 (Settlement Offer to NLRB at 2) ("We strongly suggest that the Board ensure
     that the employees are aware of these offers and that they have a say in the decision.   They may not like

28   the alternative. . . .   Therefore, the only alternative [Vista] will have is to close down its facility").

1      employment."[123]

2      The court agrees that Vista's October 2014 letter explicitly threatens closure of the facility.  The court

3      also agrees that the threat must be understood as being made in response to union activity.  The letter

4      was sent to the NLRB after the union had presented a petition for appointment as the employees'

5      representative, and after it had charged violations of § 8(a).  It concerned settlement of claims alleging

6      unfair business practices in violation of the NLRA.  The Board was prompted to file the claims that led

7      to the settlement proposal due to union activity and complaints.  Thus, Vista's threat must be understood

8      in context as threatening facility closure in response to union activity.  Consequently, the court finds that

9      petitioner has adduced some evidence that Vista violated § 8(a)(1) by threatening facility closure in

10     response to union activity.

11                              **(9)      Conclusion**

12            Petitioner has adduced far more than the low threshold of "some evidence" supporting its charge

13     that Vista violated § 8(a)(1).  Accordingly, the court finds that it has satisfied the Ninth Circuit's

14     likelihood of success test for a § 10(j) injunction.

15                              **ii.      Section 8(a)(3)**

16            Section 8(a)(3) prohibits employers from changing an employee's terms and conditions of

17     employment to encourage or discourage union activity.  29 U.S.C. § 158(a)(3).  Under *Wright Line,* 251

18     N.L.R.B. 1083 (1980), to prove a violation of § 8(a)(3), petitioner must establish by a preponderance of

19     the evidence that anti-union sentiment was a substantial or motivating factor in the challenged employer

20     decision.  *Bridgestone Firestone,* 350 N.L.R.B. 526, 529 (2007).  "To show discriminatory motivation,

21     Petitioner must establish the following: (1) the employee was engaged in union activity, (2) employer

22     had knowledge of that activity, and (3) anti-union animus by the employer."  See *Garcia*, 2014 WL

23     5343814 at *16 (citing *Sears, Roebuck & Co.*, 337 N.L.R.B. 443, 443 (2002)).  In the absence of direct

24     evidence, animus cannot be lightly inferred.  *NLRB v. Gulf States United Telephone Co.*, 694 F.2d 92,

25     95 (5th Cir. 1982).  Once petitioner establishes a prima facie case, the burden of persuasion "shift[s] to

26     the employer to demonstrate that the same action would have taken place even in the absence of the

27     _____

28            [123]Petition, Exh. 5 at 770 (Vista Settlement Offer dated 10/9/14).

1 protected conduct." *Wright Line,* 251 N.L.R.B. at 1089.  Stated differently, the respondent must

2 demonstrate by a preponderance of the evidence that it would have taken the same action in the absence

3 of knowledge that the employee was engaging in protected activity.  See *Hicks Oil & Hicksgas, Inc.*, 293

4 N.L.R.B. 84, 85 (1989).

5 <center>**(1)      Whether Vista Employees Engaged in Union Activities**</center>

6 Petitioner adduces evidence that all of the employees Vista laid off, with the exception of

7 Carmerlina Perdomo, signed the union petition.  Martha Aparicio and Delfina Sanchez were terminated

8 on October 18 and October 15, 2013, respectively.[124]   Both signed the union petition.[125]   Between

9 October 25 and 28, 2013, Vista laid off seven of the eight employees in its housekeeping department.

10 Six of the seven employees that were laid off – Dafny Cobar, Romana Lopez, Rosa Lopez, Elisa

11 Mayorga, Maria Menjivar, and Genaro Meza – signed the union petition.[126]   The only person terminated

12 who did not sign the petition was Perdomo.  Accordingly, Vista has adduced some evidence that Vista

13 employees engaged in union acitivities.  Vista does not contend otherwise.

14 <center>**(2)      Whether Vista Was Aware of the Union Activity**</center>

15 Petitioner correctly argues that the fact Perdomo did not sign the petition does not undermine a

16 finding that Vista knew the terminated employees had engaged in union activities because her lay-off

17 was part of a "mass discharge."  Where employees are terminated in a mass discharge, the NLRB does

18 not require a showing of "correlation between each employee's union activity and his or her discharge.

19 . . .  Instead, the [ ] burden [i]s to establish that the mass discharge was ordered to discourage union

20 activity or in retaliation for the protected activity of some." *Davis Supermarkets, Inc. v. N.L.R.B.*, 2 F.3d

21 1162, 1169 (D.C. Cir. 1993) (citing *ACTIV Industries*, 277 NLRB 356, 356 n.3 (1985)).  Indeed,

22 "[l]ayoffs intended to 'discourage membership in any labor organization' violate the NLRA, even if the

23 employer wields an undiscerning axe, and anti-union employees suffer along with their pro-union

24

25 [124]Petition, Exh. 3 at 328:23-27 (Delfina Sanchez Affidavit); *id*. at 427:19-20 (Martha Aparicio
Affidavit).

26

27 [125]*Id*., Exh. 3 at 401 (signed union petition).

28 [126]*Id*.; *id*. at 497 (Rosa Lopez Affidavit, ¶ 18) (indicating that Rosa Lopez and Elisa Mayorga
were present at petition presentation to Valdivia).

<center>37</center>

1    counterparts." *N.L.R.B. v. Frigid Storage, Inc.*, 934 F.2d 506, 510 (4th Cir. 1991) (citing *Birch Run*

2    *Welding & Fabricating v. NLRB,* 761 F.2d 1175, 1180 (6th Cir. 1985); *Merchants Truck Line v. NLRB,*

3    577 F.2d 1011, 1016 (5th Cir. 1978); *Majestic Molded Products, Inc. v. NLRB,* 330 F.2d 603, 606 (2d

4    Cir. 1964)).  This is because "[t]he issue is the employer's motivation, and he cannot cleanse an impure

5    heart with ignorance of individual employee sentiments."  *Frigid Storage, Inc.*, 934 F.2d at 510.

6            Vista contends it did not know of the discharged employees' involvement in union organizing

7    at the times it made the decision to terminate them.  It proffers its contract with Pro-Clean, executed on

8    October 3, 2013, as evidence of its motivation for terminating employees in the housekeeping

9    department.[127]  The contract states that it will commence on October 3, 2013, and that its scope includes

10   "provid[ing] all . . . management, supervision, labor, and materials necessary to perform the

11   housekeeping and laundry services on the premises of the facility."[128]  It explains that all "existing

12   housekeeping equipment will be absorbed and utilized by Pro-Clean in performing its duties."[129]  Citing

13   the contract, Vista contends it had decided to terminate the housekeeping employees before any union

14   activity had commenced.[130]  October 3, 2013, however, does not predate Valdivia's admitted knowledge

15   of union activity; she acknowledged that she had some knowledge of union activity as early as August

16   8, 2013.[131]  Valdivia asserts that Vista began negotiations with Pro-Clean "some time in the summer of

17   2013," that the agreement was "finalized in late September or early October [2013]," and that it was

18   signed on October 3, 2013.[132]  Even if the court credits these assertions, late September is almost two

19   months after Valdivia admitted that she knew union activity was taking place; it is more than a month

20   after she began to tell Vista employees not to open their doors to union representatives, as they might

21

22          [127]*Id*., Exh. 5 at 756-758 (Pro-Clean Contract dated 10/3/13).

23          [128]*Id*. at 756.

24          [129]*Id*.

25          [130]Opposition at 25.

26          [131]*Id.*, Exh. 3 at 513:22-23 (Rosa Valdivia Affidavit) ("[E]mployees stated reporting to me

27   various incidents [and on] 8/8/13 I learned that there was some kind of union activity going on").

28          [132]Valdivia Decl., ¶ 13.

be "thieves."[133]  Moreover, although Valvidia can pinpoint by month when the contract was finalized, she offers only the vague statement that negotiations with Pro-Clean began "sometime in the summer." Given her ability to recall other key dates in Vista's relationship with Pro-Clean, the "sometime in the summer" reference suggests a desire to obfuscate the sequence of knowledge of union activity and negotiations.  The court therefore concludes that petitioner has adduced evidence that Vista knew of the union activity not only before terminating the housekeeping staff, but before signing the Pro-Clean contract.  It finds it likely she knew of the union activity before commencing negotiations with Pro-Clean as well.

The court reaches the same conclusion with respect to petitioner's claim concerning the discharge of Martha Aparicio and Delfina Sanchez.  Sanchez and Aparicio were fired on October 15 and 18, 2013, respectively; there is no evidence that the decision to terminate these CNAs was made prior to August 8, 2013.  Although Vista argues that the investigation concerning the sleeping incident "was mostly concluded" by the time the union petition was served on October 14, 2013, it proffers no evidence corroborating this assertion.[134]  Nor does the court find persuasive Vista's argument that this case is analogous to *Bayliner Marine Corporation*, 215 NLRB 12 (1974).  There, the "only evidence bearing on [the employer's] knowledge of general union activity [wa]s the admission by several of [its] officials that they had heard 'rumors about a union.'"  *Id.* at 12.  The only evidence suggesting union activity was entirely equivocal: "occasionally there was a union mentioned in the plant but it was on a continuing

---

[133]*Id.*, Exh. 3 at 381 (Marcos Salvador Affidavit, ¶ 14) ("Rosa Valdivia called a meeting of employees.  It took place in the hallway to the right of the nurse's station.  There was Renya Artola, Kiran [Singh], Remedios Lopez, Jeanette Aguillera, and myself.  Ester [Cuellar] was there also. Valdivia did the speaking. . . . She said that we needed to be careful because there were some thieves visiting houses because they had stolen some documentation from her including all the employee information.  She said that they would identify themselves as from the [u]nion.  She said this was not true and they were actually thieves. . . . She said that we should not open our doors because they would look at everything we had so that they could steal it").  See also *id.*, Exh. 3 at 497 (Rosa Lopez Affidavit, ¶ 16) ("I think the Employer had a general idea that there was some union organizing going on. . . . [A] few days after the Union visited me, Rosa Valdivia called me. . . . She told me that she heard people were visiting employees at their homes.  She said that I should not let them in because they might be thieves.  She did not mention the word union").

[134]Opposition at 25.

1   basis. . . . [I]t was neither more intense or any less intense than it had been for years." *Id*.  Moreover,

2   and in contrast to the situation here, the supervisor "who ordered the discharges of the employees

3   involved, testified that he had not heard even general rumors about a union . . . at the time of the

4   discharges." *Id*.  Valdivia admits she knew of union activity as early as August 8, 2013,[135] and there is

5   no suggestion that there had been prior, protracted mention of the possibility of a union as in *Bayliner*.

6   More fundamentally, it is clear that Valdivia was fully aware that union activity was not a mere "rumor"

7   on August 14, 2013, when the petition was presented.  Both Sanchez and Aparicio were fired after this

8   event.  *Bayliner* is therefore inapposite.

9          Consequently, the court finds that petitioner has adduced some evidence supporting its claim that

10  Vista was aware of the union activity, and specifically aware that Aparicio and Sanchez had been

11  involved in it before they were terminated.  The court thus proceeds to analyze the remaining factor.

12                         **(3)      Whether Vista Had Anti-Union Animus**

13         Petitioner advances a number of different bases on which the court can infer animus.  The court

14  addresses each in turn, except to the extent the argument concerns the mass layoff of the housing

15  department.  The court need not address that issue further given petitioner's failure to adduce evidence

16  that Vista knew of union activity at the time it decided to terminate the housekeeping staff and replace

17  them with purportedly less expensive subcontracted employees.       Petitioner contends first that Vista's

18  "expressed hostility" toward the union supports an inference of unlawful motive.  "Inference of an

19  employer's unlawful motive [toward an employee-activist] may be drawn from the employer's hostility

20  toward the union."  *Hall v. NLRB*, 941 F.2d 684, 688 (8th Cir. 1991).  Indeed, "evidence of hostility

21  shows *even more* than animus."  *In Re Orland Park Motor Cars, Inc*., 333 NLRB 1017, 1068 (2001).

22  Petitioner cites evidence that, on October 22, 2013, after Aparicio and Sanchez were discharged, Ester

23  Ceullar said that Vista had hired new CNAs for the night shift because Valdivia "want[ed] to get rid of

24  all the people who signed the union thing."[136]  Vista objects that this evidence is unauthenticated hearsay.

25

26         [135]*Id*., Exh. 3 at 513:22-23 (Rosa Valdivia Affidavit) ("[E]mployees started reporting to me

27  various incidents [and on] 8/8/13 I learned that there was some kind of union activity going on").

28         [136]*Id*., Exh. 3 at 556 (Note from Ingrid Castillo).

1    The court declines to consider the exhibit because it is not signed by its purported author, Castillo, nor

2    authenticated by a witness with personal knowledge of the document.   Under Rule 901 of the Federal

3    Rules of Evidence, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the

4    proponent must produce evidence sufficient to support a finding that the item is what the proponent

5    claims it is."  FED.R.EVID. 901(a).  Rule 901(b) provides a non-exhaustive list of examples of methods

6    that can be used to authenticate evidence.  Among these is "[t]estimony that an item is what it is claimed

7    to be," and the "appearance, contents, substance, internal patterns, or other distinctive characteristics of

8    the item, taken together with all the circumstances."  FED.R.EVID. 901(b)(1), (4).  Here, the exhibit is

9    handwritten, contains no authenticating indicia, and is unsigned.  Castillo, moreover, does not reference

10   the document in her affidavit.  Although petitioner has proffered the declaration of Lisa Gude, a

11   representative of the union, she did not write the document, nor does she state that it is what it is claimed

12   to be.[137]  Accordingly, the exhibit is not authenticated.

13        It is also inadmissible hearsay.  Petitioner argues that the letter is a "business record" admissible

14   under Rule 803(6).  This is incorrect.  "[B]ecause Rule 803(6) requires business records to be kept in

15   the regular course of a business activity, records created in anticipation of litigation do not fall within

16   its definition."  *United States v. Feliz*, 467 F.3d 227, 234 (2d Cir. 2006); see *Sana v. Hawaiian Cruises,*

17   *Ltd.*, 181 F.3d 1041, 1046 (9th Cir. 1999) ("Courts are rightfully wary when parties create self-serving

18   documents and seek to offer them as business records"); *Timberlake Constr. Co., v. U.S. Fidelity and*

19   *Guar. Co.*, 71 F.3d 335, 341-342 (10th Cir. 1995) (holding that letters addressing a dispute that was the

20   subject of litigation were written in anticipation of litigation and, therefore did not fall within the

21   business record exception because "[i]t is well-established that one who prepares a document in

22   anticipation of litigation is not acting in the regular course of business").  The court is mindful that it can

23   consider otherwise inadmissible evidence in ruling on a preliminary injunction.  Here, however, the

24   evidence is not only unauthenticated, but it does not appear it could be introduced at trial because it is

25   inadmissible hearsay.  Additionally, the court's decision to disregard the evidence is strengthened by the

26   fact that Castillo does not include statements corroborating those in the writing in her sworn declaration;

27

28        [137]*Id.*, Exh. 3 at 550 (Lisa Gude Declaration).

1    the writing, moreover, even if it is Castillo's, is not sworn.

2         Petitioner next asserts that it is clear from Warner's text messages that Vista had an anti-union

3    animus.  He cites the text messages from Warner to Remedios Lopez, which stated that Valdivia was

4    "retaliating against the CNA. [sic] Formation of the union," and that she was "so mad about this union

5    business" that she did not want to name anyone employee of the month.[138]  This constitutes evidence of

6    overt hostility, and supports an inference of animus.  Vista contends the evidence should not be

7    considered because it is unauthenticated hearsay.  The evidence, however, is authenticated.  It is attached

8    to Lopez's affidavit, who states that the exhibit is a "true and correct copy of text messages that [she]

9    received from Jeri [Warner] in January 2014."[139]  She also states that the cell phone in the picture

10   belongs to her, and that the phone number listed as sender belongs to Warner.[140]  This is sufficient to

11   authenticate the text messages.  See *United States v. Mebrtatu*, 543 Fed. Appx. 137, 140 (3d Cir. Oct.

12   30, 2013) (Unpub. Disp.) (admitting text message evidence after noting that the"burden of proof for

13   authentication is slight" and that all "that is required is a foundation from which the fact-finder could

14   legitimately infer that the evidence is what the proponent claims it to be").

15        Vista also contends that the messages are hearsay because they are out-of-court statements

16   offered for their truth.  They are correct that the text messages are out-of-court statements that convey

17   Warner's observations and that are offered for their truth.  There is no reason, however, to believe that

18   Warner would not be willing to directly testify to the observations she communicated in the text

19   messages.  Indeed, she specifically states that she would be willing to speak with the union in one of the

20   texts.[141]  Accordingly, because this is a preliminary injunction, the court will not discredit Warner's

21   observations simply because in their current form they are hearsay.

22        To the extent Vista contends the text messages contain two levels of inadmissible hearsay

23

24   [138]*Id*., Exh. 3 at 450-454 (Text Messages)

25   [139]*Id*., Exh. 3 at 443 (Remedios Lopez Affidavit).

26   [140]*Id*.

27   [141]*Id*. at 450 (Text Messages) ("What is the name of your union and the local number?"); *id.* at
28   457 ("I do need to let the labor board know that [Valdivia] fired them as retaliation").

1    because Warner relates out-of-court statements by Valdivia, it is mistaken. Rule 801(d)(2) provides that

2    a statement is not hearsay if it is offered against an opposing party and "was made by the party's agent

3    or employee on a matter within the scope of that relationship." See FED.R.EVID. 801(d)(2)(D).  To fall

4    within the scope of Rule 801(d)(2)(D), petitioner must show that the challenged statement was made by

5    an "agent or servant" of the Vista.  Here, it is undisputed that Valdivia, as Vista's administrator, was

6    charged with authority to manage personnel and otherwise conduct day-to-day business at Vista.  Her

7    statements concerning the termination of employees and unwillingness to designate an employee of the

8    month plainly fall within the scope of her employment duties.  For that reason, they are not hearsay and

9    there is not a second level hearsay problem.  Notably, Vista does not contend otherwise.  It mistakenly

10   argues that the statements are inadmissible because Warner was not employed by Vista when she sent

11   the text messages.  Initially, there is no evidence in the record that Warner was not employed when she

12   sent the texts.  In any event, the court has elected to consider Warner's statements and observations

13   because it presumes petitioner could present this evidence in admissible form at a trial.  Accordingly,

14   the court finds that petitioner has adduced some evidence of anti-union animus.

15        Petitioner also argues that Vista's disparate treatment of employees supports a finding of animus.

16   The Board has repeatedly held that an employer that treats active union supporters differently than other

17   employees violates § 8(a)(3).  See, e.g., *Allied Med. Transp., Inc.*, 360 NLRB No. 142, 2014 WL

18   2987961, *6 (July 2, 2014) ("In October, when Rowe confronted both Desir and Etienne about alleged

19   fare delinquencies, he permitted both to continue working while he conducted an investigation.  Shortly

20   after the election, however, Rowe provided no similar opportunity to active union supporters Fertil and

21   Nicolas, both of whom he suspended pending an investigation.  Based on this disparate treatment and

22   the Respondent's failure to investigate, we find that the Respondent failed to show that it would have

23   suspended and discharged Fertil and Nicolas in the absence of their union activities and, therefore,

24   violated Section 8(a)(3)"); *Pollock Elec., Inc.*, 349 NLRB 708, 709 (2007) (concluding that an employer

25   engaged in disparate treatment by discharging a union supporter while only suspending, pending

26   investigation, another employee whose conduct was effectively the same); *Watkins Engineers &*

27   *Constructors, Inc*., 333 NLRB 818, 819 (2001) (disparate treatment of union and nonunion applicants

28   is evidence of anti-union animus).

43

Petitioner proffers evidence that Aparicio and Sanchez were discharged for sleeping, but that Maria Lopez – whom Aparicio and Sanchez contend was also sleeping, but who did not sign the union petition – was not discharged.  Both Aparicio and Sanchez testified that Maria Lopez was sleeping, and Adelman, who reported the nurses for sleeping, stated that there were five employees sleeping.[142]  One of the five individuals was apparently a third-party hospice provider;[143] the remaining people who fell asleep were Sanchez, Aparicio, Maria Lopez, and charge nurse Abaunza.  Despite the fact that Sanchez and Aparicio testified that Maria Lopez was sleeping, Valdivia initially terminated only Sanchez and Aparicio.  Later, she also terminated Abaunza.[144]  Maria Lopez, however, was never terminated.

Vista argues that Maria Lopez was working in another building, Vista Del Mar, and hence could not have been one of the sleeping CNAs.  It proffers its October work schedule, which does not have an "x" indicating that Maria Lopez worked on October 6, 2013.[145]  Vista also submits what is purportedly a list of employees working on Sunday night, October 6, 2013; the only employees listed are Delfina Sanchez, Martha Aparicio, and Jennifer Abaunza.[146]  While the evidence is conflicting, the court concludes that Vista's evidence does not suffice to defeat petitioner's showing.  Vista proffers no witness testimony that Maria Lopez did not work on October 6, 2013.  The fact that Aparicio and Sanchez both state, based on firsthand knowledge, that Lopez was working that night is more persuasive in finding facts than the fact a schedule lacks an "x" next to Lopez's name.  As a general matter, documents of this

---

[142]*Id.*, Exh. 3 at 426 (Martha Aparicio Affidavit, ¶ 21) ("At a certain point, I heard someone say 'girls!' and we all woke up.  It looked like Maria and Defina had been asleep.  I think they were asleep.  It looked like they were just waking up. . . .  She said the son of the patient in room 18 had just taken pictures of us.  We all got up and continued working").  See also *id.* at 326 (Delfina Sanchez Affidavit, ¶ 10) (indicating that she and "Maria Lopez, Martha Aparicio, and Jennifer [Abaunza] all fell asleep").

[143]*Id.*, Exh. 3 at 534 (Thomas Adelman Affidavit) ("When I went into my mom's room, I saw an Indian guy, who did not work for Vista Del Sol but for VITAS Hospice, a 24-hour hospice care company, sleeping on two chairs. . .").

[144]Valdivia Decl., ¶ 12 ("Indeed, there were three employees terminated not two.  Soon after, the two employees who were photographed as sleeping on the job were terminated.  We also terminated Jennifer Abaunza who was the LVN in charge").

[145]Opposition, Exh. A at 59 (October Work Schedule).

[146]*Id.* at 60 (10/6/13 Employee List).

1    type often contain errors or are incomplete.  The majority of the x's on the schedule are typewritten,

2    suggesting that the schedule was compiled in advance and was subject to change; only a spattering of

3    the x's for the entire month are handwritten.  The same is true of the list of employees working on

4    October 6, 2013.  The night shift in question is located at the bottom of the page; it is possible that

5    additional employees could have been listed on a second page.  Drawing such an inference is supported

6    by the fact that the other shifts identified list four or five CNAs and a charge nurse, while the shift in

7    question lists only two CNAs and one charge nurse.  It is possible, of course, that fewer nurses are on

8    duty at night than during the day.  Sanchez, however, states that a fourth CNA was working that night,

9    whom she identifies as "CNA Aurora."  According to Sanchez, Aurora "was not sleeping."[147]  Having

10   evaluated the competing evidence, the court finds petitioner's proof more credible and persuasive, and

11   hence concludes that he has adduced at least some evidence supporting a finding of animus based on the

12   disparate treatment of Aparicio and Sanchez.

13   Petitioner contends that the timing of all the layoffs and the lack of investigation preceding

14   Aparicio's and Sanchez's discharge is also indicative of animus.  The timing of a discharge can serve

15   as evidence of animus.  See *Garcia*, 2014 WL 5343814 at *22 ("Certainly the timing of these alleged

16   acts by Respondent is suspicious, coming about after Castillo openly supported the Union"); *In Re Lucky

17   Cab Co.*, 360 NLRB No. 43, 2014 WL 670231, *37 n.38 (Feb. 20, 2014) ("Discharges on the heels of

18   union activity and evidence of disparate treatment support a finding of pretextual termination," citing

19   *La Gloria Oil & Gas Co.,* 337 NLRB 1120, 1124 (2002)).

20   Sanchez and Aparicio were terminated on October 15 and 18, 2013 respectively – one and four

21   days after the union petition was presented to Valdivia.  The mass layoff of the housekeeping department

22   occurred from October 25 to 28, 2013 – within two weeks of the petition being presented.  This timing

23   is "suspicious."  See *Garcia*, 2014 WL 5343814 at *22 ("Petitioner has provided sufficient evidence that

24   Respondent worsened his work conditions as a result of his Union support because of the timing of these

25   alleged acts"); see also *Golden Day Sch., Inc. v. N.L.R.B.*, 644 F.2d 834, 838 (9th Cir. 1981) ("The

---

[147]Petition, Exh. 3 at 326 (Delfina Sanchez Affidavit) ("CNA Aurora was also working that night, but she was not sleeping").

1  record amply supports the Board's finding that the discharges were motivated by antiunion bias.  The

2  discharges followed immediately upon union organizing activity in which the discharged employees

3  participated.  Golden Day evidenced strong antiunion bias by announcing to its assembled workers that

4  there would be no union, and by the timing, nature, and extent of interrogation of individual

5  employees").

6     "The failure to conduct a meaningful investigation and to give the employee who is the subject

7  of the investigation an opportunity to explain are [likewise] clear indicia of discriminatory intent."  See

8  *New Orleans Cold Storage & Warehouse Co., Ltd.*, 326 NLRB 1471, 1477 (1998), enfd. 201 F.3d 592

9  (5th Cir. 2000); *K & M Electronics*, 283 NLRB 279, 291 (1987) (same); see also *PCC Structurals, Inc.*,

10  330 NLRB 868, 896 (2000) ("Finally, it is very significant that Schwanz, asserting that this chalkboard

11  message was the 'final straw,' never even provided Maloney with an opportunity to demonstrate that the

12  message was not negatively directed at Green but rather was designed to encourage continued support

13  for the Union").

14     Vista proffers no evidence and makes no argument that Sanchez and Aparicio were given a

15  meaningful opportunity to explain their side of the story; both asserted that they had previously been

16  permitted to sleep during the night shift.[148]  When Sanchez tried to explained that this was the usual

17  practice, and that CNAs had received permission to sleep in the past, Warner said she had no choice but

18  to fire her, because Valdivia had directed that she do so.[149]  Taken together, the court finds that petitioner

19  has adduced some evidence suggesting anti-union animus based on the timing of Sanchez's and

20  Aparicio's discharge and the lack of any meaningful investigation preceding it.

21     Petitioner asserts that Vista's departure from past practices further supports a finding of animus

22   

23     [148]*Id.*, Exh. 3 at 425 (Martha Aparicio Affidavit, ¶ 10) ("CNAs would sleep during their break[s].

24  . . . This was the practice the entire time I worked for the Employer. . . .  The charge nurses knew about us sleeping on breaks.  Usually, they would be right there working at the nurse's station while we slept

25  on breaks.  Sometimes the charge nurses would even sleep along with us").  See also *id.* at 327 (Delfina Sanchez Affidavit, ¶ 18) ("Basically, almost every night I saw at least [sic] CNA asleep for a few

26  minutes or an hour").

27     [149]*Id.*, Exh. 3 at 427 (Delfina Sanchez Affidavit, ¶ 26) ("I said that [the incident] happened a month ago.  I also said she sent word to us telling us not to worry.  [Warner] said that they were orders

28  from Rosa Valdivia and that she had to terminate me").

1   and discriminatory motive with respect to the discharge of Sanchez and Aparicio.  See *Bryant & Stratton*

2   *Business Institute*, 321 NLRB 1007, 1026-1028 (1996), enfd, 140 F.3d 169 (2d Cir. 1998) (holding that

3   an employer unlawfully disciplined faculty members for ending class periods early where discipline had

4   not previously been imposed for that reason); *Thill, Inc.*, 298 NLRB 669, 670 (1990) (the "singling out

5   of . . . two [employees] for warnings on the basis of conduct for which no other employee had ever been

6   warned" was evidence of animus); see also *In Re Lucky Cab Co.*, 2014 WL 670231 at *31 ("departure

7   from past practices" constitutes circumstantial evidence of animus).

8       As noted, petitioner has adduced testimony that nurses routinely slept on the job, and that charge

9   nurses knew this (and even slept themselves).[150]  Valdivia concedes that Vista had not previously

10  terminated an employee for sleeping on the job, although she asserts that Vista had no "notice of any

11  other employees sleeping on the job before."[151]  The timing of the changed practice is suspicious, and,

12  given testimony indicating that sleeping on the job was common during breaks, Vista's discharge of

13  employees for sleeping gives rise to an inference of anti-union animus.

14      Finally, petitioner correctly argues that the existence of other unfair labor practices (i.e.,

15  violations of § 8(a)(1)) reinforces a finding of animus.  The court need not shut its eyes to the totality

16  of the circumstances, or unnecessarily focus on isolated events.  See *Elec. Data Sys. Corp.*, 305 NLRB

17  219, 219 (1991) ("Even without direct evidence, the Board may infer animus from all the

18  circumstances," citing *Mistletoe Express Service*, 295 NLRB 273, 275 (1989); *Birch Run Welding*, 269

19  NLRB 756, 764-767 (1984), enfd. 761 F.2d 1175 (6th Cir. 1987)).  Considering the circumstantial

20  evidence of animus discussed in this section, in combination with Vista's numerous § 8(a)(1) violations,

21  the court is satisfied that petitioner has adduced adequate evidence to support a reasonable inference of

22  anti-union animus.

23  ─────────────────

24      [150]*Id.*, Exh. 3 at 425 (Martha Aparicio Affidavit, ¶ 10) ("CNAs would sleep during their break[s]
    . . . . This was the practice the entire time I worked for the Employer. . . . The charge nurses knew about
25  us sleeping on breaks.  Usually, they would be right there working at the nurse's station while we slept
    on breaks.  Sometimes the chrage nurses would even sleep along with us.").  See also *id.* at 327 (Delfina
26  Sanchez Affidavit, ¶ 18) ("Basically, almost every night I saw at least [sic] CNA asleep for a few
27  minutes or an hour").

28      [151]Valdivia Decl., ¶ 12.

47

1    Vista contends that petitioner's § 8(a)(3) claim fails because it would have discharged Aparicio,

2    Sanchez, and the housekeeping department in any event.[152]  The court is not persuaded.  As respects

3    Aparicio and Sanchez, Vista's argument is based solely on the fact that its employee handbook states

4    that sleeping on the job is punishable by immediate termination.  Petitioner's evidence, however,

5    suggests that Vista did not enforce this policy, and that its employees routinely slept during their

6    breaks.[153]  Vista's argument concerning the mass layoff of the housekeeping department is even more

7    feeble.  It contends that its "president operates several facilities, all of which subcontract these services,"

8    and that it "simply brought this facility in line with [its president's] other business practices."[154]  Vista

9    cites no evidence in support of this assertion, and hence the court entitles it to no weight.  In any event,

10   the fact that Vista violated the NLRA in myriad other way during the same period it decided to terminate

11   Aparicio, Sanchez, and the housekeeping department renders implausible the suggestion that its decision

12   to begin enforcing its no sleeping policy or to out source its housekeeping operations was justified.  In

13   short, the evidence petitioner has adduced strongly suggests that Vista's "reasons for the personnel

14   decision were pretextual."  *Pro-Spec Painting, Inc.*, 339 NLRB 946, 949 (2003) (citing *National Steel

15   & Shipbuilding Co.*, 324 NLRB 1114, 1119 n. 11 (1997)). See also *Laro Maintenance Corp. v. NLRB*,

16   56 F.3d 224, 229 (D.C. Cir. 1955) ("When the employer presents a legitimate basis for its actions which

17   the factfinder concludes is pretextual . . . the factfinder may not only properly infer that there is some

18   other motive, but that the motive is one that the employer desires to conceal – an unlawful motive,"

19   citing *Shattuck Denn Mining Corp. v. NLRB*, 362 F.2d 466, 470 (9th Cir. 1996) (internal quotations

20   omitted)).

21          "A finding of pretext defeats any attempt by the [employer] to show that it would have

22

23          [152]Opposition at 30.

24          [153]*Id.*, Exh. 3 at 425 (Martha Aparicio Affidavit, ¶ 10) ("CNAs would sleep during their break[s]
25   . . . . This was the practice the entire time I worked for the Employer. . . . The charge nurses knew about
     us sleeping on breaks.  Usually, they would be right there working at the nurse's station while we slept
26   on breaks.  Sometimes the chrage nurses would even sleep along with us.").  See also *id.* at 327 (Delfina
     Sanchez Affidavit, ¶ 18) ("Basically, almost every night I saw at least [sic] CNA asleep for a few
27   minutes or an hour").

28          [154]Opposition at 31.

discharged the [employees] absent their union activities.  This is because where 'the evidence establishes that the reasons given for the [employer]'s action are pretextual – that is, either false or not in fact relied upon – the [employer] fails by definition to show that it would have taken the same action for those reasons, absent the protected conduct. . . ."  *Rood Trucking Co., Inc.*, 342 NLRB 895, 898 (2004) (quoting *Golden State Foods Corp.*, 340 NLRB 382, 385 (2003) (in turn citing *Limestone Apparel Corp.*, 255 NLRB 722 (1981)).  See also *Sanderson Farms, Inc.*, 340 NLRB 402, 402-03 (2003) ("The Respondent's reason for discharging Noland was, therefore, pretextual and defeats its attempt to show that it would have discharged Noland absent his union activities").

Petitioner has adduced some evidence that Vista's discharge of Aparicio, Sanchez, and the housekeeping department was pretextual.  Because he has also adduced evidence that Vista knew Aparicio, Sanchez, and members of the housekeeping department were involved with the union, as well as evidence that supports a reasonable inference of anti-union animus, the court finds that petitioner has shown a likelihood of success on its § 8(a)(3) claim.

### iii.    Section 8(a)(5)

Section 8(a)(5) prohibits an employer from refusing "to bargain collectively with the representatives of its employees, subject to the provision of section 159(a) of this title." 29 U.S.C. § 158.  Petitioner argues that, under *NLRB v. Gissel Packing Co., Inc.*, 395 U.S. 575 (1969), Vista is obligated to recognize and bargain with the union because signed employee authorization cards reflect majority support for the union.  In *Gissel Packing*, the Supreme Court held that the NLRB can order an employer to recognize and bargain with a union even when employees have not chosen union representation through the normal election procedure.  Such an order is appropriate in two circumstances.  When an employer has engaged in such "outrageous" and "pervasive" unfair labor practices "that a fair and reliable election [cannot] be held," the NLRB can order bargaining even absent a showing of majority support for the union.  See *id.* at 613-14.  The NLRB can also order bargaining when the union shows that it once had a majority and that its support was "undermined" by unfair practices that "impede[d] the election process." *Id.* at 614.  The Ninth Circuit has upheld "interim bargaining orders" on the grounds that the purpose of a § 10(j) injunction is to protect the integrity of the collective bargaining process.  See *Scott ex rel. N.L.R.B. v. Stephen Dunn & Associates*, 241 F.3d

652, 661 (9th Cir. 2001) ("To permit illegal employer conduct to go unaddressed while the Board's corrective machinery grinds toward resolution would subvert the underlying purposes of § 10(j) and allow those who commit unfair labor practices to reap the benefits of that conduct.  Interim bargaining orders are therefore sometimes necessary to preserve the status quo pending litigation before the Board").

Petitioner argues that the union once had majority support among Vista employees, and this its support was "undermined" by unfair practices that "impede[d] the election process."  This requires a two-pronged showing: (1) that a majority of Vista's employees supported the union; and (2) that Vista engaged in unfair labor practices that undermined the majority and impeded the holding of an election. *Scott*, 241 F.3d at 662.

### (1)      Whether the Union Obtained a Majority

Petitioner argues that as of October 13, 2013, the union had collected authorization cards from a majority of the bargaining unit of 46 individuals.  The evidence supports this argument.  Petitioner proffers 32 union authorization cards, each of which was purportedly signed by a Vista employee.[155]  He also proffers an affidavit signed by Dafny Cobar authenticating her authorization card.[156]  See *Scott*, 241 F.3d at 662 ("[T]he Regional Director would fail the first prong of the *Gissel* test for issuance of a bargaining order [if he failed to authenticate the authorization cards].  But the Regional Director need only show that one card is valid to satisfy the likelihood of success prong under *Miller*").  Consequently, the court finds that petitioner has adduced some evidence that the union obtained authorization cards from a majority of the 46 individuals in bargaining unit.

### (2)      Whether Vista Engaged in Unfair Labor Practices that Undermined the Majority and Impeded the Holding of an

---

[155]Petition, Exh. 4 at 557-589 (Union Authorization Cards).

[156]*Id.*, Exh. 4 at 590 (Dafny Cobar Affidavit) ("Union organizer Eduardo [(no last name provided)] gave me the blank authorization card.  This took place on or about October 11, 2013 at my residence.  I was employed at that point by Employer. I rea the card, filled it out and signed it and I gave it back to him right away. The Board Agent has showed me a copy of my original authorization card and I was able to look over it and I can say that it is the authorization card that I filled out on or about October 11, 2013.").

**Election**

In deciding whether Vista engaged in unfair labor practices that undermined the majority and impeded the holding of an election, the court is mindful that the Ninth Circuit has cautioned courts not to impose an "inappropriately high [standard] of proof." *Id.* at 664. The Regional Director can satisfy the Ninth Circuit's likelihood of success standard "by demonstrating a 'fair chance' that the Board is likely to issue a bargaining order subsequent to full adjudication of the merits." *Id.* Because a bargaining order is both "an extreme and unusual exercise of the Board's authority," *id.*, however, it must support its imposition of this remedy with "'specific findings as to the immediate and residual impact of the unfair labor practices on the election process.'" *National Labor Relations Board v. Pacific Southwest Airlines,* 550 F.2d 1148, 1152 (9th Cir. 1977) (quoting *Peerless of America, Inc. v. National Labor Relations Board,* 484 F.2d 1108, 1118 (7th Cir. 1973)). "Thus, whether the Board will issue a bargaining order in the underlying administrative proceeding turns on the effect of the alleged unfair labor practices on a subsequent representation election. This inquiry is not mechanistic, but rather requires consideration of the specific facts of each case." *Scott,* 241 F.3d at 664.

Certain violations have regularly been regarded by the Board and the courts as highly coercive. "These are the so-called 'hallmark' violations and their presence will support the issuance of a bargaining order unless some significant mitigating circumstance exists. They include . . . the reassignment, demotion or discharge of union adherents in violation of § 8(a)(3) of the [NLRA]." *N.L.R.B. v. Jamaica Towing, Inc.*, 632 F.2d 208, 212 13 (2d Cir. 1980); see *Scott,* 241 F.3d at 666 ("The existence of at least one 'hallmark' violation of the NLRA . . . is sufficient to satisfy this minimal test and allow a consideration of the balance of hardships resulting from an interim bargaining order").

Petitioner asserts the facts of this case support entry of a *Gissel* order. The court agrees. Here, as outlined, immediately after the union obtained a majority of signatures and presented the petition to Valdivia on October 14, 2013, Vista fired Sanchez and Aparicio on October 15 and 18, 2013;[157] it then

---

[157]*Id.*, Exh. 3 at 328 (Defina Sanchez Affidavit, ¶ 23) ("She said that she was sorry but that she was obligated to terminate me. She that I was not a good nurse because I had fallen asleep when I was not supposed to have done so"); *id.* at 427 (Martha Aparicio Affidavit, ¶ 28) ("I told [Warner] that the night shift charge nurse gave me permission [to sleep] so I thought it was okay and I was doing that for

1    proceeded to terminate all housekeeping staff except Ramon Lopez, who openly expressed anti-union

2    sentiments. In total, Vista terminated seven of eight housekeeping employees, six of whom had signed

3    the union petition; in addition, it discharged Sanchez and Aparicio, who also signed the petition.[158] This

4    hallmark violation of § 8(a)(3), which occurred within two weeks of presentation of the union petition,

5    sufficiently demonstrates a likelihood of success on the claim for a *Gissel* order under *Scott*, 241 F.3d

6    at 666. See also *N.L.R.B. v. Gordon*, 792 F.2d 29, 33 (2d Cir. 1986) ("we agree that a *Gissel* bargaining

7    order is clearly warranted to remedy the Respondent's unfair labor practices, which the judge aptly

8    described as the 'unlawful discharge of an entire bargaining unit, lock, stock and barrel, for the express

9    purpose of avoiding the statutory bargaining obligation'"); *N.L.R.B. v. Bighorn Beverage*, 614 F.2d 1238,

10    1243 (9th Cir. 1980) (enforcing a *Gissel* order where "the discharge of only one employee, Mortensen,

11    resulted in the termination of 25 percent of the employees in the particular bargaining unit"); *Willms v.*

12    *Guard Pub. Co.*, No. CV 01-06079 TC, 2001 WL 34038572, *17 (D. Or. May 1, 2001) (granting a

13    *Gissel* order where "Respondent's unfair labor practices include[d] the unlawful discharge of Kama Cox,

14    a leading union advocate"), aff'd sub nom. *Willms v. Guard Publ'g Co.*, 25 Fed. Appx. 620 (9th Cir. Jan.

15    10, 2002) (Unpub. Disp.); *Balsam Village Mgmt. Co.*, 273 NLRB 420, 420 (1984) (bargaining order was

16    "clearly warranted" to remedy the "unlawful discharge of an entire bargaining unit, lock, stock and

17    barrel, for the express purpose of avoiding the statutory bargaining obligation").

18        In addition, the court has concluded that Vista also threatened closure of the facility in response

19    to unionization efforts.[159] Like the discharge of union supporters, such threats constitute a "hallmark"

20    NLRA violation that will support imposition of a *Gissel* order. See *Jamaica Towing, Inc.*, 632 F.2d at

21    212 (hallmark violations include "such employer misbehavior as the closing of a plant or threats of plant

22    closure or loss of employment"). Accordingly, a *Gissel* order is appropriate for this reason as well. See

23

24    years. . . . She said [ ] they were going to have to let me go. . . . She said that they were orders from

25    Rosa Valdivia and that she had to terminate me").

26        [158]*Id.*, Exh. 3 at 401 (signed union petition).

27        [159]*Id.*, Exh. 5 at 770 (Settlement Offer to NLRB at 2) ("We strongly suggest that the Board ensure

28    that the employees are aware of these offers and that they have a say in the decision. They may not like
the alternative. . . . Therefore, the only alternative [Vista] will have is to close down its facility.").

1    *id.*; *Be-Lo Stores v. N.L.R.B.*, 126 F.3d 268, 298 (4th Cir. 1997) ("The threat of a store closure is a

2    'hallmark' violation that, in itself – absent significant mitigating circumstances evidencing that the

3    violative conduct is not as serious as it might seem – can support a *Gissel* order"); *Indiana Cal Pro,*

4    *Inc. v. N.L.R.B.*, 863 F.2d 1292, 1301 (6th Cir. 1988) ("Courts have repeatedly held that in view of an

5    employee's natural interest in continued employment, threats of plant closure are 'among the most

6    flagrant' of unfair labor practices, quoting *Gissel*, 395 U.S. at 611 n. 31); *Piggly Wiggly, Tuscaloosa Div.*

7    *Commodores Point Terminal Corp. v. NLRB,* 705 F.2d 1537, 1542 (11th Cir. 1983) ("[I]t is well

8    established that threats of plant closures, by themselves, can justify a *Gissel* order"); *Chemvet Labs.,*

9    *Inc. v. N.L.R.B.*, 497 F.2d 445, 448 (8th Cir. 1974) (holding that threats of a plant closure are "the most

10   potent" instruments of employer interference); see also *Great Chinese Am. Sewing Company*, 227 NLRB

11   1670, 1670 (1977) ("The Administrative Law Judge found that, although Respondents suffered

12   substantial economic loss in an 8-month period preceding their shutdown of the Great Chinese American

13   Sewing Company plant (GCA) and had been urged repeatedly by their accountant to close the GCA

14   operation, the reason for the GCA closure was not solely economic.  That the precipitating reason was

15   the advent of the Union.  He therefore found that the GCA plant closure with the consequent termination

16   of employees violated Section 8(a)(3) of the Act. To remedy the unfair labor practices, he ordered that

17   Respondents reopen GCA and recognize and bargain with the Union").

18          Vista, of course, engaged in other actions that violated § 8(a)(1).  Within days after the union

19   petition was presented, it began to enforce its dress code and tardiness policy more strictly, and

20   prohibited the wearing of union insignia.  It interrogated and polled employees regarding their union

21   sympathies and created the impression of surveillance.  Petitioner also correctly notes that "bargaining

22   orders are more likely to issue when unfair labor practices have been visited upon small units of

23   employees."  *Scott*, 241 F.3d at 665; *National Labor Relations Board v. Bighorn Beverage,* 614 F.2d

24   1238, 1243 (9th Cir. 1980) ("The probable impact of unfair labor practices is increased," and a

25   bargaining order is therefore more appropriate "when a small bargaining unit . . . is involved").  Here,

26   the bargaining order is directed to a small unit of only 46 employees.  Taken together, Vista's numerous

27   §§ 8(a)(1) and (a)(3) violations, which are discussed in detail in this order, are adequate to satisfy the

28   second prong of the test for a *Gissel* order.  The court therefore finds that petitioner has met his burden

of adducing some evidence supporting the imposition of a *Gissel* order.

### C.     Irreparable Harm

#### 1.     Legal Standard Governing Irreparable Harm

Irreparable harm is "that for which compensatory damages are unsuitable." *MGM Studios, Inc. v. Grokster, Ltd.*, 518 F.Supp.2d 1197, 1210 (C.D. Cal. 2007) (quoting *Wildmon v. Berwick Universal Pictures*, 983 F.2d 21, 24 (5th Cir. 1992)).  If the harm to the plaintiff is merely monetary, it "will not usually support injunctive relief." *American Trucking Associations*, 559 F.3d at 1057. See also *California Pharmacists Association v. Maxwell-Jolly*, 563 F.3d 847, 851-52 (9th Cir. 2009) ("Typically, monetary harm does not constitute irreparable harm. . . .  Economic damages are not traditionally considered irreparable because the injury *can later be remedied by a damage award*" (emphasis original)).

To warrant injunctive relief, it is not enough that the claimed harm be irreparable; it must be imminent as well. *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *Los Angeles Mem'l Coliseum v. Nat'l Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980); see also  *Amylin Pharmaceuticals, Inc. v. Eli Lilly and Co.*, 456 Fed. Appx. 676, 679 (9th Cir. Oct. 31, 2011) (Unpub. Disp.) ("[E]stablishing a threat of irreparable harm in the indefinite future is not enough"); *California Dump Truck Owners Ass'n v. Nichols*, No. 11–cv–00384–MCE–GGH, 2012 WL 273162, *3 (E.D. Cal. Jan. 30, 2012) (quoting *Amlyin*).  Nor does speculative injury constitute irreparable harm sufficient to warrant granting a preliminary injunction. *Carribean Marine Servs.*, 844 F.2d at 674 (citing *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984)).

Applying these standards, "[a] plaintiff must do more than merely allege imminent harm. . . ; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs.*, 844 F.2d at 674 (emphasis original).  To do so, he must proffer probative evidence that the threatened injury is imminent and irreparable. *Am. Passage Media Corp. v. Cass Communications, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (reversing the entry of a preliminary injunction because the movant failed to adduce evidence of irreparable harm); *Bell Atlantic Business Systems, Inc. v. Storage Tech. Corp.*, No. C–94–0235, 1994 WL 125173, *3 (N.D.

1   Cal. Mar. 31, 1994) (denying a motion for preliminary injunction because the movant failed to

2   adduce sufficient evidence of a threat of irreparable harm).  Conclusory affidavits are insufficient

3   to demonstrate irreparable harm.  *Am. Passage Media Corp.*, 750 F.2d at 1473.

4        In *Winter*, the Supreme Court held that the irreparable injury standard previously employed

5   in the Ninth Circuit – that a "possibility" of irreparable injury sufficed to support entry of a

6   preliminary injunction if plaintiff made a strong showing of likely success on the merits – was too

7   lenient.  Rather, it concluded the plaintiff must demonstrate that irreparable injury is "*likely* in the

8   absence of an injunction."  *Winter*, 555 U.S. at 22 (emphasis original); *American Trucking*

9   *Associations*, 559 F.3d at 1052; see also 11A C. Wright & A. Miller, FEDERAL PRACTICE AND

10  PROCEDURE § 2948.1, p. 139 (2d ed. 1995) (an applicant must demonstrate that in the absence of

11  preliminary relief, she "is likely to suffer irreparable harm before a decision on the merits can be

12  rendered").  Thus, following *Winter*, a plaintiff seeking a preliminary injunction must show that he

13  will likely suffer irreparable harm if an injunction does not issue.  *Winter*, 555 U.S. at 20; see

14  *Johnson*, 572 F.3d at 1081 ("[P]reliminary injunctive relief is available only if plaintiffs [also]

15  'demonstrate that irreparable injury is likely in the absence of an injunction,'" quoting *Winter*, 555

16  U.S. 22).[160]

17       In the Ninth Circuit, a Regional Director seeking an injunction under § 10(j) must show that

18  irreparable harm is likely under *Winter*.  *Small v. Avanti Health Systems, LLC*, 661 F.3d 1180, 1191 (9th

19  Cir. 2011).  The Ninth Circuit has emphasized, however, that "the Director need not prove that

20  irreparable harm is certain or even nearly certain."  *Id.*  It has also commented that an] alleged unfair

21  labor practice to reach fruition and thereby render meaningless the Board's remedial authority *is*

22  irreparable harm."  *Id.* (citing *Frankl*, 650 F.3d at 1362 (holding that the district court did not abuse its

23  direction in determining that the Director showed a likelihood of irreparable harm where he established

24

25       [160]As noted earlier, *Winter* requires that plaintiff also show a likelihood of success on the merits.
26  *Winter*, 555 U.S. at 20.  Interpreting this standard, the Ninth Circuit has held that serious questions
    going to the merits and a balance of hardships that tips sharply in favor of the plaintiff can support
27  issuance of a preliminary injunction if plaintiff shows there is a likelihood of irreparable injury and
28  the injunction is in the public interest.  *Alliance for the Wild Rockies*, 632 F.3d at 1135.

a likelihood of success on the merits)).

### 2.      Whether Petitioner has Demonstrated Irreparable Harm Absent an Injunction

Petitioner argues that the irreparable effects of Vista's unlawful termination of employees are obvious, given that they have had a significant chilling effect on the remaining employees.  Numerous Vista employees have indicated that, as a result of the terminations and anti-union sentiment expressed by Vista, they feared losing their jobs because they supported the union.  For example, Maria Ramirez stated on October 29, 2013, that "[a]s a result[ ] of [her] coworkers' termination, [she] ha[d] fear of losing [her] job because [she] supported the [u]nion."[161]  She also stated that "[e]very day that [she] clock[s] in at the start time or time[s] out, [she] feel[s] that [ ] Valdivia will call [her] into her office and will fire [her]."[162]  Ivania Rueda testified that she was "afraid to lose [her] job for . . . supporting the [u]nion."[163]

Rueda also reported that she overheard Maria Ramirez and Romana Lopez say that they were "afraid to participate in the [u]nion after [their] coworkers were discharged and laid off."[164]  Elisa Mayorga stated that on October 29, 2013, she heard "Reyna [Artola] say that she [was] afraid she was going to lose her job just like [Mayorga and the others] did."  She also reported hearing Remedios Lopez, Reyna [Artola], and Maria Ramirez state that they were "afraid to wear the [u]nion shirts now."[165]

The court is mindful of the fact that this testimony is hearsay; because the testimony is supported by numerous accounts of similar fears, however, the court finds the evidence sufficiently trustworthy to give it some weight.  See *Flynt*, 734 F.2d at 1394 ("The Harveys argue that Flynt's evidence is hearsay. . . . The trial court may give even inadmissible evidence some weight, when to do so serves the purpose

---

[161]*Id.*, Exh 3 at 409 (Maria Ramirez Affidavit).

[162]*Id.*

[163]*Id.*, Exh. 3 at 361 (Ivania Rueda Affidavit).

[164]*Id.*

[165]*Id.*, Exh. 3 at 345 (Elisa Mayorga Affidavit)

of preventing irreparable harm before trial"); *Souza v. California Dep't of Transp.*, No. CV 13-04407 JD, 2014 WL 1760346, *7 (N.D. Cal. May 2, 2014) ("While Caltrans also makes additional objections such as hearsay, in deciding a preliminary injunction, the district court 'may give even inadmissible evidence [including hearsay] some weight, when to do so serves the purpose of preventing irreparable harm before trial'" (citation omitted)).

On October 30, 2013, Maria Rodriguez indicated that she had the same fears as these employees; she stated that she was "aware that employees ha[d] been fired," and that she thought they had been fired "because they supported the [u]nion."[166] She conceded she feared that she "could be next because [she had] signed the [u]nion petition."[167]   Likewise, Maria Menjivar stated that "[a]s a result of [the termination of the CNAs], [she] felt that [she] could lose her job for supporting the [u]nion and signing the petition. . . . [O]ther employees, including Rosa Lopez, Cobar, and Elisa Mayorga [told Menjivar] that they felt the same way."[168]

Marcos Salvador and Reyna Artola testified they felt they could be fired for supporting the union.[169]   Specifically, in November 2013, Salvador stated that "[n]ow that so many employees have been fired or laid-off, I feel that I could be next.  I believe that they were let go because they supported the [u]nion." He also stated that after the layoffs in October 2013, "employees stopped attending [u]nion meetings."[170]   More recently, on October 3, 2014, Artola stated that "[r]ight after [Vista] fired the housekeepers, [she] was afraid that [she] would get fired too. . . .   After the housekeepers were fired, employees were scared to support the [u]nion because they said they had families to support and they did not want to get fired.  [She] heard the following employees say they were afraid to get fired: Marcos

[166]*Id.*, Exh. 3 at 392 (Maria Angelica Rodriguez Affidavit).

[167]*Id.*

[168]*Id.*, Exh. 3 at 398-99 (Maria Menjivar Affidavit).

[169]*Id.*, Exh. 3 at 284 (Marcos Salvador Affidavit).

[170]*Id.* at 387:9-16.

Salvador, Kiran [Singh], Diana Hernandez, Yolanda Hernandez, and Maria Ramirez."[171]  She went on to state that CNA Omela Cuesta signed a union authorization card, "but after the housekeepers were fired, she stopped supporting the [u]nion as well."[172]

It is well settled that "the fear of employer retaliation after the firing of union supporters is exactly the 'irreparable harm' contemplated by § 10(j)." *Pye v. Excel Case Ready*, 238 F.3d 69, 75 (1st Cir. 2001); *Asseo v. Centro Medico Del Turabo*, 900 F.2d 445, 454 (1st Cir. 1990) ("As the district court concluded, there was a very real danger that if Turabo continued to withhold recognition from the Union, employee support would erode to such an extent that the Union could no longer represent those employees.  At that point, any final remedy which the Board could impose would be ineffective"); see also *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1572 (7th Cir. 1996) (noting the "chilling effect" on union organizing that often follows the illegal discharge of key union members).  The fears expressed by numerous Vista employees that they will be discharged or mistreated if they continue to support the union is sufficient to justify a finding of irreparable harm.

"In a similar vein, 'the discharge of active and open union supporters risks a serious adverse impact on employee interest in unionization and can create irreparable harm to the collective bargaining process." *Frankl*, 650 F.3d at 1363 (quoting *Pye*, 238 F.3d at 74).  Thus, there is support for a finding of irreparable harm with respect to petitioner's § 8(a)(3) claim as well.  See *id*. ("a likelihood of success as to a § 8(a)(3) violation with regard to union activists that occurred during contract negotiations or an organizing drive largely establishes likely irreparable harm, absent unusual circumstances")

Vista does not dispute that the cases the court has cited are on point.  Instead, it contends that petitioner's delay in filing a petition warrants a finding that Vista employees are not likely to suffer

---

[171]*Id*., Exh. 3 at 474:20-475:9 (Reyna Artola Affidavit).

[172]*Id*. at 475:22-476:2.  Although this evidence too is hearsay, it appears trustworthy given the totality of the evidence presented by petitioner and Vista.  Moreover, petitioner could easily compel the out-of-court declarants to testify at trial.  The court therefore finds that the evidence is entitled to some weight in the analysis.  See *Flynt*, 734 F.2d at 1394 (hearsay evidence is entitled to "some weight, when [giving the evidence weight] serves the purpose of preventing irreparable harm before trial").

irreparable harm.[173]  Vista cites *McDermott v. Veritas Health Servs., Inc.* ("*Veritas Health*"), No. CV 11-2852 PA (OPx), 2011 WL 2693922, *5 (C.D. Cal. May 9, 2011).  There, the court found that the Regional Director had failed to establish a likelihood of irreparable harm.  It noted that the alleged incidents of employee discipline underlying the unfair labor practice charges took place in April and May 2010.  *Id*.  The Regional Director, however, did not seek preliminary injunctive relief until April 5, 2011 – a year after the alleged violations took place.  *Id*.  As a result, the court noted, a considerable amount of time had passed since the incidents that allegedly cost the union support and diminished the strength of its organizing efforts.  *Id*.  The court relied on Ninth Circuit precedent holding that although "'[d]elay by itself is not a determinative factor in whether the grant of interim relief is just and proper[,]' the factor of delay is significant 'if the harm has occurred and the parties cannot be returned to the status quo or if the Board's final order is likely to be as effective as an order for interim relief.'"  *Id*. (quoting *McDermott ex rel. NLRB v. Ampersand Publ'g, LLC*, 593 F.3d 950, 963 (9th Cir. 2010) (alterations in *Veritas Health*)).  Based on *McDermott*, the *Veritas Health* court concluded that "[g]iven the amount of time that ha[d] passed since [the employer's] unfair labor practices, any loss of support or diminished strength that the [u]nion might have suffered has likely already been realized."  *Id*.  The Ninth Circuit affirmed the court's decision, citing a lack of irreparable harm.  *McDermott v. Veritas Health Servs., Inc.* ("*Veritas Health II*"), 469 Fed. Appx. 544 (9th Cir. Feb. 24, 2012) (Unpub. Disp.).

In *Frankl*, 650 F.3d at 1363-64, by contrast, the Ninth Circuit came to a different conclusion.  The court discussed *McDermott*, 593 F.3d at 963 – the same case on which the *Veritas Health* court relied – and determined that it did not preclude a finding of irreparable harm in a case in which the Regional Director waited thirteen to seventeen months to file a § 10(j) petition.  *Frankl*, 650 F.3d at 1363-64.  The *Frankl* court distinguished *McDermott* because the case involved First Amendment issues and the court thus applied a "special, heightened standard."  *Id*. at 1364.  See also *McDermott*, 593 F.3d at 964 ("*In light of the First Amendment issues in this case*, we conclude that the district court did not abuse its discretion by declining to grant preliminary relief.  The standard for such relief is a tough one"

---

[173]Opposition at 33.

(emphasis added)).[174]

Second, the *Frankl* court explained that, unlike in *McDermott*, "the record provided specific support for the conclusions that there would likely be irreparable harm beyond that which could be remedied once the Board had ruled, and that interim relief was more likely to curb the ongoing unfair labor practices than subsequent relief." *Frankl*, 650 F.3d at1364. Finally, the court observed that the "passage of time did not entirely preclude the District Court's ability to restore the status quo," in part because the union remained "willing to represent the employees and to bargain on their behalf under an interim bargaining order." *Id.*

In this case, the court concludes that the NLRB's delay does not undermine a finding of irreparable harm. See *Sharp ex rel. N.L.R.B. v. Webco Indus., Inc.*, 225 F.3d 1130, 1136 (10th Cir. 2000) ("Although the amount of time that may elapse before the Board's action can be considered unreasonable is, to a large extent, case-specific, there is a certain leniency that the Board must be afforded, stemming from the deference to the Board that is built into the statutory scheme," citing *Pascarell v. Vibra Screw Inc.*, 904 F.2d 874, 881 (3d Cir. 1990)). Initially, the court finds petitioner's argument that Vista's conduct throughout the pendency of this action has made it difficult for them to file this motion in a more timely manner credible and persuasive. As noted, Vista filed a motion seeking to enjoin the NLRB from enforcing administrative subpoenas,[175] which in turn prompted the NLRB to file its own application seeking judicial enforcement of the subpoenas. That litigation consumed some four months, and did not conclude until the court issued an order on July 7, 2014.[176] That order did not require production of documents responsive to the subpoenas for an additional twenty days, or the better part of another

---

[174]In *McDermott*, the NLRB "sought to enjoin members of a trade union from displaying banners that announced a labor dispute, alleging that the action constituted an unfair labor practice." 593 F.3d at 958. The Ninth Circuit thus held that "a higher bar than usual" applied since "there [was] at least *some risk* that constitutionally protected speech will be enjoined." *Id.* (quoting *Overstreet v. United Bhd. of Carpenters*, 409 F.3d 1199, 1208 n. 13 (9th Cir. 2005)). There are no First Amendment concerns presented by the petition in this case.

[175]Complaint, Case No. CV 14-2193-MMM, Docket No. 1 (Mar. 21, 2014).

[176]Order Granting in Part and Denying in Part Order Compelling Compliance with Administrative Subpoenas; Granting Motion to Dismiss, Case No. CV 14-3337 MMM, Docket No. 20 (Jul. 7, 2014).

1   month.[177]   While the necessity of filing and prosecuting that litigation does not explain the totality of

2   petitioner's delay, it substantially narrow the range of time during which the NLRB can fairly be said

3   to have delayed, given that certain of the documents sought were integral to its ability to adduce evidence

4   of Vista's NLRA violations.  See *id.* (noting that "several factors are relevant" to assessing delay: "(1)

5   the Board's historical progress has been lumbering at best, and the resultant backlog necessitates some

6   delay, (2) the Board needs a reasonable period of time to investigate, deliberate, and authorize the filing

7   of a § 10(j) action, and (3) in this case, the Board filed a substantially amended complaint, so that the

8   unfair labor charges were finalized just four and a half months before the filing the § 10(j) petition").

9         The court, moreover, agrees with petitioner that this case is analogous to *Frankl*.  First, like

10  *Frankl*, and unlike *McDermott*, the action not involve First Amendment concerns.  Further, as petitioner

11  contends, there is abundant evidence that Vista's unfair business practices have caused employees to fear

12  supporting the union throughout the pendency of the NLRB action.  Given that the court has found it

13  appropriate to enter a *Gissel* order, there is no question that Vista employees who are part of the

14  collective bargaining unit continue to face a significant risk of irreparable harm if Vista is not enjoined

15  from further unfair business practices.  Further unfair business practices would severely undermine the

16  vitality of the court's *Gissel* order and order reinstating the wrongfully terminated employees.  If Vista

17  employees do not feel comfortable expressing support for the union, and if they are unable to bargain

18  in an environment free of unfair business practices, this will seriously undercut the *Gissel* order the court

19  intends to issue.  As a result, § 8(a)(1) "relief in this case is intimately tied up with the interim bargaining

20  order."  See *Frankl*, 650 F.3d at 1364.  For this reason, Vista cannot reasonably contend that an order

21  enjoining further violations of § 8(a)(1) will not aid in restoring the status quo, nor can it assert  that

22  interim relief would be no more effective than an order from the Board.  See *McDermott*, 593 F.3d at

23  965 ("The factor of delay 'is only significant if the harm has occurred and the parties cannot be returned

24  to the status quo or if the Board's final order is likely to be as effective as an order for interim relief'").

25  This is especially true in light of the fact that the NLRB's backlog of cases causes matters before it to

26  move at a "notoriously glacial" pace.  See *Lineback v. Irving Ready Mix, Inc.*, 653 F.3d 566, 570 (7th

27

28        [177]*Id.* at 42.

1    Cir. 2011) ("The goal [of a § 10(j) injunction] is to protect the integrity of the collective bargaining

2    process and to preserve the  Board's power to provide effective remedies for violations despite the

3    'notoriously glacial' pace of Board proceedings," quoting *Kinney v. Pioneer Press*, 881 F.2d 485, 491

4    (7th Cir. 1989) (stating that "[t]he district judge must assess . . . the harm that may go unchecked during

5    the 'notoriously glacial' course of NLRB proceedings" and vacating the denial of § 10(j) injunction));

6    *Boire v. Int'l Bhd. of Teamsters*, 479 F.2d 778, 788 (5th Cir. 1973) ("The notoriously glacial immobility

7    of the Board could easily drag the unit clarification out for a year or more, and by that time, the

8    Teamsters would invariably be able to get a toe-hold on the Florida operation that would prove most

9    difficult to overcome. . . .  It is precisely such an occurrence that § 10(j) was designed to prevent")).

10       Thus, as in *Frankl*, despite the delay, the record supports findings that "there [will] likely be

11   irreparable harm beyond that which could be remedied once the Board had ruled, and that interim relief

12   [is] more likely to curb the ongoing unfair labor practices than subsequent relief."  *Frankl*, 650 F.3d

13   at1364; *Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 750 (9th Cir. 1988)  ("Delay is only significant

14   if the harm has occurred and the parties cannot be returned to the status quo or if the Board's final order

15   is likely to be as effective as an order for interim relief"), overruled on other grounds by *Miller*, 19 F.3d

16   at 457.

17       Reinstatement of the wrongfully terminated employees, moreover, will undoubtedly serve to

18   revive the union's organizational campaign at Vista.  See *Frankl*, 650 F.3d at 1364 ("Having current

19   employees on the bargaining committee in daily contact with the other employees and therefore able to

20   judge the impact of various bargaining proposals on their constituencies is likely to affect not only the

21   other employees' willingness to adhere to union support, but also the interim bargaining process itself.

22   For that reason, the § 8(a)(3) relief in this case is intimately tied up with the interim bargaining order.");

23   *Aguayo*, 853 F.2d at 750 ("Although interim reinstatement [of a terminated employee] may not precisely

24   restore the status quo in the case before us, it would revive the union's organizational campaign at

25   Tomco"); *Norelli v. HTH Corp.*, 699 F.Supp.2d 1176, 1203-04 (D. Haw. 2010) ("As more time passes,

26   it becomes less likely that these discharged employees will return to the Hotel, which 'may itself cause

27   irreparable injury to the unionization effort.'  At least as of today, however, the employees wish to return

28   to the Hotel.  Accordingly, the delay in time does not make injunctive relief any less necessary to prevent

ongoing harm and ensure the effectiveness of a Board final order.").   The union remains eager to represent Vista employees, given the request for a *Gissel* order, and the employees appear to have an interest in continued employment with Vista, based on the fact that settlement discussions involved the prospect of reinstatement.[178]

"Finally, of course, there is the fact that [the Ninth Circuit panels in] *McDermott* [and *Veritas Health II*] [were] reviewing denial of interim relief under an abuse-of-discretion standard," which is highly deferential and does not imply that such relief cannot properly be granted in this case.   *Frankl*, 650 F.3d at 1364-65.

For all of these reasons, the court finds that petitioner has made an adequate showing of irreparable harm.

### D.     Balance of Hardships and Public Interest

"In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."   *Amoco Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 542 (1987).   See also *International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993) ("In evaluating the balance of hardships a court must consider the impact granting or denying a motion for a preliminary injunction will have on the respective enterprises").   It must also "consider the public interest as a factor in balancing the hardships when the public interest may be affected."   *Caribbean Marine Servs.*, 844 F.2d at 674. Specifically, in assessing whether a Regional Director has satisfied the balance of the equities prong, "the district court must take into account the probability that declining to issue the injunction will permit the alleged unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority."   *Small*, 661 F.3d at 1196 (citing *Frankl*, 650 F.3d at 1365).

### 1.     Balance of Hardships

Petitioner argues that the balance of hardships tips decidedly in favor of issuing a preliminary injunction.   He contends that absent reinstatement of the discharged employees, the Board's remedial

---

[178]*Id*., Exh. 5 at 770 (Settlement Offer to NLRB at 1) (listing offers involving reinstatement and monetary compensation as well as offers solely for monetary compensation).

1　authority to order reinstatement will likely become meaningless with the passage of time; he notes

2　as well that current Vista employees will continue to live in fear of discharge, and the union will

3　unjustly go unrecognized by Vista.  See *Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 938

4　(9th Cir. 1987) (concluding that "damages and [subsequent] reinstatement would not remedy the

5　coercive inhibitory effects upon the employees' organizational rights"); *Electro-Voice, Inc.*, 83 F.3d

6　at 1573 (reinstating discharged employees was necessary to remedy the likelihood of diminishing

7　support for the union while awaiting a final Board order).  As employees await a decision by the

8　Board, moreover, they may be forced to relocate to different cities or geographical areas to support

9　their families and themselves.  See *Garcia*, 2014 WL 5343814 at *25 (finding similar issues weighed

10　in favor of granting interim relief).

11　　　　On the other hand, Vista faces little in the way of hardship if interim relief is not granted.  An

12　injunction will simply require Vista to cease engaging in unfair labor practices, to reinstate employees

13　it wrongfully terminated, and to recognize the union it should have recognized long ago.  Vista contends

14　that the balance of the hardships tips in its favor because being required to reinstate "the sleeping nurses"

15　would allow other employees to infer that such conduct is acceptable, and because it would incur great

16　costs canceling the Pro-Clean.[179]  As the court has found, there is significant evidence suggesting that

17　the motivation for these discharges was pretextual.  It therefore finds Vista's argument unavailing.

18　Vista's assertion that budgetary issues will require it to discharge newly hired replacement workers is

19　unpersuasive for two reasons.  First, "the predominant focus under section 10(j) is the harm to the

20　bargaining process, not to individual employees."  *Aguayo*, 853 F.2d at 750 (citing *Kobell v. Suburban*

21　*Lines, Inc.*, 731 F.2d 1076, 1093 (3d Cir. 1984)).  Second, to the extent Vista has hired new workers,

22　"the rights of the employees who were discriminatorily discharged are superior to the rights of those

23　whom the employer hired to take their places."  *Id.* (citing *Maram v. Universidad Interamericana De*

24　*Puerto Rico, Inc.*, 722 F.2d 953, 959 (1st Cir. 1983)).

25　　　　Accordingly, the court finds that the balance of hardships weighs in favor of entry of an

26　injunction.

27

28　　　　[179]Opposition at 34.

64

### 2. Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Romero-Barcelo*, 456 U.S. at 312. "The public interest analysis for the issuance of a preliminary injunction requires [the court] to consider 'whether there exists some critical public interest that would be injured by the grant of preliminary relief.'" *Maxwell-Jolly*, 572 F.3d at 659 (quoting *Hybritech Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1458 (Fed. Cir. 1988)). "The plaintiffs bear the initial burden of showing that [issuance of an] injunction is in the public interest." *Stormans*, 586 F.3d at 1139. The district court "need not consider public consequences that are 'highly speculative.'" *Id.* (quoting *Golden Gate Restaurant Association v. City & County of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008)). "In other words, the court should weigh the public interest in light of the likely consequences of the injunction. Such consequences must not be too remote, insubstantial, or speculative and must be supported by evidence." *Id.*

In "§ 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge." *Small*, 661 F.3d at 1197 (citing *Frankl*, 650 F.3d at 1365). Moreover, the public interest favors ensuring compliance with federal law. See *N.D. v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1113 (9th Cir. 2010) ("[I]t is obvious that compliance with the law is in the public interest"). When the Regional Director makes a strong showing of likelihood of success and of irreparable harm, he "will have established that preliminary relief is in the public interest." *Small*, 661 F.3d at 1197 (citing *Frankl*, 650 F.3d at 1365).

Petitioner argues that he has made a strong showing of likelihood of success and irreparable harm, and that this warrants a finding that injunctive relief would be in the public interest under *Small* and *Frankl*. The court agrees. It therefore finds that the public interest supports granting injunctive relief. See *id.* ("[O]rdinarily . . . when, as here, the Director makes a strong showing of likelihood of success and of likelihood of irreparable harm, the Director will have established that preliminary relief is in the public interest. The district court did not abuse its discretion in finding that the public interest supports the grant of a preliminary injunction"); *Garcia*, 2014 WL 5343814 at *25 ("Here, Petitioner has shown that she has a likelihood of success and thus, the Court finds that it is in the public interest

to halt Respondent's alleged unlawful acts and to preserve the Board's remedial power").

### III.  CONCLUSION

For the reasons stated, petitioner's  motion for a preliminary injunction is granted.  The court will enter a preliminary injunction enjoining Vista from engaging in further unfair business practices under § 8(a)(1), and ordering the reinstatement of Sanchez, Aparicio, and all members of the housekeeping department terminated in October 2013.  The court will also enter a *Gissel* order requiring Vista to recognize and bargain with the union and collective bargaining unit during the pendency of the NLRB proceedings.

DATED: January 21, 2015

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE